# No. 19-55616

In the
## United States Court of Appeals for the Ninth Circuit

DAVID CASSIRER, THE ESTATE OF AVA CASSIRER, and
UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY,
a California non-profit corporation,

*Plaintiffs-Appellants,*

v.

THYSSEN-BORNEMISZA COLLECTION FOUNDATION,

*Defendant-Appellee.*

Appeal from the United States District Court,
Central District of California, Case No. 2:05-cv-03549-JFW-E,
Honorable John F. Walter, District Judge

## PLAINTIFFS-APPELLANTS' PETITION FOR REHEARING AND REHEARING EN BANC

SAMUEL J. DUBBIN, P.A.
DUBBIN & KRAVETZ LLP
1200 Anastasia Avenue
Suite 300
Coral Gables, FL 33134
(305) 371-4700

LAURA W. BRILL
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067
(310) 556-2700

DAVID BOIES
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

*Counsel for Plaintiffs-Appellants*

*[Additional Counsel Listed Inside Cover]*


COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER


STEPHEN N. ZACK
ANDREW S. BRENNER
BOIES SCHILLER FLEXNER LLP
100 S.E. Second Street
Suite 2800
Miami, FL 33131
(305) 539-8400

DAVID A. BARRETT
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

BENJAMIN P. SOLOMON-SCHWARTZ
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
(202) 237-2727

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

RULE 35 STATEMENT REGARDING EN BANC REVIEW .............................. 1

INTRODUCTION ............................................................................ 2

FACTS AND PROCEDURAL BACKGROUND ..................................... 4

REASONS FOR GRANTING REHEARING  OR REHEARING EN BANC ........ 7

I.    This Case "Involves a Question of Exceptional Importance" under
Rule 35 ...................................................................................... 8

II.   The Decision Misapplies California's Choice-of-Law Principles and
Requires Correction to Avoid Manifest Injustice .......................... 10

    A.    California's Laws, Policies, and Interests Clearly Outweigh
Those of Spain in the Particular Context of this Case ...................... 11

    B.    The Decision Fails to Apply the Rule that the Proponent of
Foreign Law Bears the Burden to Overcome the Presumption
that California Law Applies ................................................. 15

    C.    The Decision Incorrectly Applies California's Comparative
Impairment Test ............................................................. 16

        1.    Whether the laws are directed specifically at the question at
issue, or are general in nature ................................... 16

        2.    Failure to address facts of this case in balancing interests ....... 17

        3.    Whether the laws are archaic and isolated or align with
modern legal trends .................................................. 18

        4.    The Painting's location is a neutral factor in California
choice-of-law ......................................................... 22

        5.    The maximum attainment of underlying purpose by all
governmental entities is achieved by applying California
law ....................................................................... 25

i

III.    The Decision Overlooks or Misapprehends Matters of Federal Law that Must Be Considered in Applying California Choice-of-Law ........................27

CONCLUSION ...........................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Cassirer v. Kingdom of Spain,*
616 F.3d 1019 (9th Cir. 2010) (en banc) ("*Cassirer I*") ...................................5, 25

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
737 F.3d 613 (9th Cir. 2013) ("*Cassirer II*") .........................................................5

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
862 F.3d 951 (9th Cir. 2017) ("*Cassirer III*") .................................... 5, 12, 18, 28

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
824 F.App'x 452 (9th Cir. 2020) ("*Cassirer IV*") ..................................... *passim*

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
596 U.S. 107 (2022) ("*Cassirer V*") ......................................................... 5, 7, 23

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
69 F.4th 554 (9th Cir. 2023) ("*Cassirer VI*") ........................................ 6, 7, 8, 22

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
89 F.4th 1226 (9th Cir. 2024) ("*Cassirer VII*") ........................................... *passim*

*Cassirer v. Kingdom of Spain,*
461 F.Supp.2d 1157 (C.D. Cal. 2006) .................................................................5

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
2019 WL 13240413 (C.D. Cal. Apr. 30, 2019) ......................................... 20, 21

*Castro v. Budget Rent-A-Car Sys., Inc.,*
154 Cal.App.4th 1162 (2007) ..............................................................................22

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.,*
960 F.3d 549 (9th Cir. 2020) ........................................................................ 17, 23

*Forcellati v. Hylands, Inc.,*
876 F. Supp. 2d 1155 (C.D. Cal. 2012) ................................................. 15, 23, 24

*Hauenstein v. Lynham,*
100 U.S. 483 (1879) ............................................................................................27

iii

*Hill v. Novartis Pharm. Corp.*,
2012 WL 967577 (E.D. Cal. Mar. 21, 2012)........................................20

*Kasel v. Remington Arms Co.,*
24 Cal.App.3d 711 (1972) ........................................................ 16, 24

*Kearney v. Salomon Smith Barney, Inc.,*
39 Cal.4th 95 (2006) ............................................................ *passim*

*McCann v. Foster Wheeler LLC*,
48 Cal.4th 68 (2010) ............................................................ 22, 23

*Menzel v. List,*
267 N.Y.S.2d 804 (N.Y.Sup.Ct. 1966)................................................29

*Naftzger v. Am. Numismatic Soc'y*,
42 Cal.App.4th 421 (1996) ...........................................................6, 12

*Newdow v. U.S. Cong.,*
328 F.3d 466 (9th Cir. 2003) ...........................................................8

*Offshore Rental Co. v. Cont'l Oil Co.,*
22 Cal.3d 157 (1978) ..................................................... 19, 20, 22, 25

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004)..................................................................24

*Solomon R. Guggenheim Found. v. Lubell,*
550 N.Y.S. 2d 618 (N.Y.App.Div. 1990) ...........................................12

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)..................................................................28

*Testa v. Katt,*
330 U.S. 386 (1947)..................................................................27

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) ........................................................12

*Washington Mut. Bank, N.A. v. Superior Court,*
24 Cal.4th 906 (2001) ...............................................................15

**Statutes**

California Code of Civil Procedure (CCP) §338(c) ........................................ *passim*

German Civil Code (BGB) §932 ................................................................... 20

Holocaust Expropriated Art Recovery ("HEAR") Act,
    Pub. L. No. 114-308, 130 Stat. 1524 ...................................................... *passim*

Holocaust Victims Redress Act ("HVRA"),
    Pub.L.No. 105-158, §202, 112 Stat. 15 ................................................ 13, 25, 28

Spanish Civil Code Article 1955 ................................................................ *passim*

Swiss Civil Code (ZGB) Arts. 3(2), 728 (ER-0022–23) ......................................... 20

**Rules and Regulations**

12 Fed.Reg. 2189, 2196 §3.15 (Apr. 3, 1947) ....................................................... 29

Fed.R.App.P. 35(a) ........................................................................................ 8

Fed.R.App.P. 40(a)(2) .................................................................................... 7

**Congressional Reports**

S.Rep.No. 114-394, 2016 WL 7156565 ................................................................ 12

**Treaties and International Agreements**

Convention on Means of Prohibiting and Preventing the Illicit Import,
    Export and Transfer of Ownership of Cultural Property (UNESCO 1970) ....... 13

European Parliament Resolution of December 17, 2003 ........................................ 14

Hague Convention 1899 ................................................................................. 19

Hague Convention 1907 ................................................................................. 28

Parliamentary Assembly of the Council of Europe, Resolution 1205 of
    November 4, 1999 ..................................................................................... 14

Regulation (EU) 2019/880 of the European Parliament and of the Council of
    17 April 2019 ............................................................................................ 14

Terezin Declaration on Holocaust Era Assets and Related Issues, U.S. DEP'T OF STATE (June 30, 2009) ...................................................................14

Vilnius Forum on Holocaust Era Looted Cultural Assets, Declaration of October 5, 2000.............................................................................14

Washington Conference Principles on Nazi-Confiscated Art, U.S. DEP'T OF STATE (Dec. 3, 1998) .........................................................................13

**Press Articles**

"Editorial: It's outrageous that a Spanish museum refuses to return Nazi-looted art to the rightful heirs," *Los Angeles Times*, Jan. 13, 2024 .....................9

"Stolen Art Outrage, Court Rules Madrid Museum Does Not Need to Return Painting Stolen by Nazis," *NBC News*, Jan. 11, 2024 .........................................9

Jeffrey Gettleman & Oleksandra Mykolyshyn, "As Russians Steal Ukraine's Art, They Attack Its Identity, Too," *N.Y. Times*, Jan. 14, 2023 ...................................................................10

Joe Parkinson, et al., "Syrian 'Monuments Men' Race to Protect Antiquities as Looting Bankrolls Terror," *Wall. St. Journal*, Feb. 10, 2015 .......................10

Kevin Rector, "A shocking turn: Nazi-looted Pissarro painting won't return to Jewish family," *Los Angeles Times*, Jan. 9, 2024............................................8

Yasmine Salam & Dan De Luce, "'Just the way the Nazis did': Evidence suggests Russians are stealing art from Ukraine on a World War II scale," *NBC News*, Apr. 6, 2023 .........................................................................9

**RULE 35 STATEMENT REGARDING EN BANC REVIEW**

This Petition by Plaintiffs-Appellants David Cassirer, *et. al*, raises several issues warranting panel rehearing or en banc review of the Court's Panel Opinion of January 9, 2024, D.E. 151, 89 F.4th 1226 (Callahan, Bea, Ikuta, CJJ.) (the "Decision").

The Decision's application of California's choice-of-law rules to select the substantive law of Spain raises issues of exceptional importance –

- The Decision misapplies the comparative impairment criteria of California's choice-of-law rules because it fails to properly credit, analyze, and weigh California's interests in applying its law, including 2010 legislation which reinforced the principles of California law that (i) a thief cannot convey good title to stolen property; and (ii) the rightful owners of stolen artworks—who here are longtime California residents—cannot be divested of title without *actual knowledge* of the work's whereabouts, resulting in manifest injustice.

- The Decision overlooks or misapprehends federal interests arising under the laws, international agreements, and policies of the United States calling for Nazi-looted artworks to be returned to the rightful owners. These are incorporated into California law under the

1

Supremacy Clause and amplify California's interests in applying its law.

- The legal and policy implications are enormous. By applying Spain's three-year adverse possession law instead of California law that prevents divestment of the rightful owner's title without actual knowledge of a stolen artwork's location, the Decision perpetuates injustice and invites today's wartime looters of cultural property in Ukraine and elsewhere to turn to Spain as a haven for selling the spoils of war.

## INTRODUCTION[1]

This action was brought originally in 2005 by Holocaust survivor and long-time California resident Claude Cassirer to recover a masterpiece Impressionist painting by Camille Pissarro, *Rue St. Honoré, Afternoon, Rain Effect*. The Painting was looted by the Nazis from Claude's grandmother, Lilly Cassirer, and is now held by defendant Thyssen-Bornemisza Collection ("TBC"), a Spanish government

---

[1]   Throughout this Brief, unless otherwise noted, all emphases are added, and internal citations and quotes are omitted. Citations to the Excerpts of Record filed in this Court's prior review of this appeal, *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F.App'x 452 (9th Cir. 2020) ("*Cassirer IV*"), are indicated as "ER-"; citations to the Supplemental Excerpts of Record filed with Plaintiffs-Appellants' June 27, 2022, Supplemental Brief, D.E. 86, are indicated as "SER-".

museum. Although TBC concedes the Nazis' theft, it has fought for over two decades to avoid returning the Painting to the Cassirers.

Claude Cassirer sued TBC under the Foreign Sovereign Immunities Act (FSIA), alleging claims for conversion and replevin under California law. Years of litigation culminated in the Decision, which held that California's choice-of-law rules require application of the substantive law of Spain (under which TBC prevails), rather than the law of California, under which the Cassirers would recover the Painting.

By applying Spain's "finders keepers" law which broadly allows adverse possession of stolen property, the Decision rejected California law that a thief cannot convey good title, and rightful owners of stolen artworks cannot be divested of title without actual knowledge of the work's whereabouts. Indeed, in 2010 the Legislature amended California Code of Civil Procedure (CCP) §338(c)(3) to reverse a Ninth Circuit decision that would have divested rightful owners of title to stolen artworks without ever knowing of their rights, *i.e.*, based on "constructive notice." Yet constructive notice is the foundation of Spain's adverse possession rule endorsed by the Decision.

In 2016, Congress followed California's lead in the Holocaust Expropriated Art Recovery (HEAR) Act, which likewise adopted an actual discovery requirement, and incorporated other U.S. laws and policies requiring restitution of Nazi-looted

artworks.  These federal laws and policies are incorporated into California law under the Supremacy Clause and must be considered in the choice-of-law analysis.

## FACTS AND PROCEDURAL BACKGROUND

At the turn of the twentieth century, the Cassirers were one of Europe's most prominent families in business, culture, and academia.  Among their achievements, cousins Paul and Bruno Cassirer championed the nascent Impressionist movement in Germany through their prestigious Berlin art gallery and publishing house.  Paul Cassirer bought *Rue Saint-Honoré*, an iconic Paris streetscape, in 1900 directly from Pissarro's exclusive agent in France, Paul Durand-Ruel.

Lilly inherited the Painting in 1926 and displayed it prominently over the sofa in her Berlin home.  A photograph in evidence shows the Painting there, and Claude Cassirer remembered playing beneath it as a child.  There is no dispute that the Nazis coerced Lilly to surrender the Painting in 1939 so that Lilly and her husband Dr. Otto Neubauer could escape from Nazi Germany.

After he was liberated from a detention camp, Claude Cassirer fled to America in 1941.  He worked as a professional photographer in New York and Cleveland before retiring to California in 1980.  Over the years, he showed friends and clients the haunting photograph of the Painting and asked them to watch for it in their travels.  In 2000, a client told Claude that she found the Painting in the TBC collection.  Claude asked Spain to return the Painting, which it refused, despite its

4

international commitments to return Nazi-looted artworks. Claude accordingly filed this action in the Central District of California. Jurisdiction was predicated in part on the museum's extensive commercial activities in the U.S. and California. *Cassirer v. Kingdom of Spain*, 461 F.Supp.2d 1157, 1173–74 (C.D. Cal. 2006), *aff'd*, 616 F.3d 1019 (9th Cir. 2010) (en banc).

Discovery showed that in 1951, a Beverly Hills art dealer smuggled the Painting out of Germany and sold it to a Los Angeles collector. It was sold again in California, held privately in Missouri, and ultimately purchased in New York in 1976 by Baron Hans Heinrich von Thyssen-Bornemisza (the "Baron"), heir to the Thyssen steel empire in Germany. The Baron hung the Painting in his bedroom chambers in Switzerland. He sold it in 1993 in a transaction in which he and Spain jointly established TBC.

The case's exceptional importance is reflected in its history, including six decisions by the Ninth Circuit (one en banc), several certiorari petitions, a plenary decision of the U.S. Supreme Court, and a certification request to the California Supreme Court.[2] A one-day bench trial addressed the narrow issues of (i) whether

---

[2] *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010 (en banc) ("*Cassirer I*") ); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013) ("*Cassirer II*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017) ("*Cassirer III*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F.App'x 452 (9th Cir. 2020) ("*Cassirer IV*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022) ("*Cassirer V*");

the Baron purchased the Painting in "good faith" under Swiss law, and (ii) whether, under Spanish law, TBC was an accessory-after-the-fact ("*encubridor*") to the Painting's theft.

These prior proceedings have made the choice of California versus Spanish substantive law case-dispositive. Under California law, the Painting would belong to the Cassirers because a thief cannot convey good title to stolen property, and the rightful owners of artworks cannot be divested of title when they lack actual knowledge of a painting's whereabouts. CCP §338(c); *Naftzger v. Am. Numismatic Soc'y*, 42 Cal.App.4th 421, 432 (1996). Under Spain's 1889 law of acquisitive prescription, or adverse possession, TBC would be entitled to keep the Painting because, as interpreted by the Ninth Circuit, title prescribes to a good faith possessor of stolen property after three years, and after six years' possession even if in bad faith, despite Claude not knowing the Painting's whereabouts before 2000. Claude asserted his claim immediately upon learning of TBC's possession, but that was nine months after expiration of the six-year prescription period. *See Cassirer IV*, 824 F.App'x at 455–56.

---

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554 (9th Cir. 2023) ("*Cassirer VI*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226 (9th Cir. 2024) ("*Cassirer VII*"). The four Ninth Circuit appeals beginning with *Cassirer III* have been heard by the same Panel (Callahan, Bea, Ikuta, CJJ.).

*Cassirer IV* decided that Spanish law applied under "federal common law" choice-of-law rules, and awarded the Painting to TBC. The U.S. Supreme Court in April 2022 unanimously reversed the use of "federal common law" to decide choice-of-law for the Cassirers' state law claims in an FSIA case. It remanded for application of California choice-of-law rules under *Erie* principles. *Cassirer V*, 596 U.S. at 114–15.[3]

Following additional briefing and oral argument, the Panel certified the choice-of-law issue to the California Supreme Court. *Cassirer VI*, 69 F.4th at 571–72. On August 9, 2023, the California Supreme Court declined to accept certification, with Justice Groban dissenting.

The Panel then decided the choice-of-law question. The Decision held that California's choice-of-law rules required application of Spanish law, and awarded title to TBC. *Cassirer VII*, 89 F.4th at 1245. This Petition followed.

## REASONS FOR GRANTING REHEARING[4]
## OR REHEARING EN BANC

Under Rule 35, en banc rehearing may be granted where "(1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions;

---

[3] Underlining the Painting's significance, the Supreme Court appended to its opinion Claude's photograph of the Painting in Lilly Cassirer's Berlin parlor. *Cassirer V*, 596 U.S. at 117.

[4] Rehearing is appropriate because, as shown below, there are points of law or fact that the Decision overlooked or misapprehended. Fed.R.App.P. 40(a)(2).

or (2) the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a). Rehearing en banc may be granted where "the interests of justice require that the decision be corrected." *Newdow v. U.S. Cong.*, 328 F.3d 466, 470 (9th Cir. 2003) (Reinhardt, J., concurring). As Judge Reinhardt explained:

> The most reasonable construction of [Fed.R.App.P. 35(a)] is that this court should rehear a case en banc when it is *both* of exceptional importance *and* the decision *requires correction*.... A decision may warrant correction because a three-judge panel has reached a result or adopted a legal rule or principle that conflicts with our existing circuit law or that the majority of our court believes is incorrect and needs further review.

*Id.* at 469 (court's emphasis).

## I. This Case "Involves a Question of Exceptional Importance" under Rule 35

The importance of this case is widely recognized. The Panel itself acknowledged the "important, unresolved public policy ramifications of broad application" that it presents. *Cassirer VI*, 69 F.4th at 557. "The case has been watched closely for decades as one that raises important legal and deeply moral questions about what is fair when it comes to Nazi-plundered artwork and other Jewish wealth." Kevin Rector, "A shocking turn: Nazi-looted Pissarro painting won't return to Jewish family," *Los Angeles Times*, Jan. 9, 2024.[5]

---

[5] https://www.latimes.com/california/story/2024-01-09/9th-circuit-rejects-familys-plea-for-paintings-return-in-high-profile-nazi-looting-case

8

*Rue St. Honoré* was indisputably looted by the Nazis. An en banc decision applying substantive California law would harmonize this Circuit's law with the overwhelming international consensus, which Spain has repeatedly joined, that Nazi-looted artworks should be returned to rightful owners. As Judge Callahan recognized, the Decision is "at odds with our moral compass." *Cassirer VII*, 89 F.4[th] at 1246 (concurring opinion). *See* "Editorial: It's outrageous that a Spanish museum refuses to return Nazi-looted art to the rightful heirs," *Los Angeles Times*, Jan. 13, 2024.[6] More broadly, reports describing restitution of stolen art are becoming increasingly frequent, with numerous examples in 2023 alone. D.E. 136 at 16–17. Fatal errors in the Decision led to this dilemma, and they should be corrected.

Nor is this merely a matter of historical principle. Looting of art and cultural property is a crime against humanity and continues today as a tactic of wartime aggressors in Ukraine, Syria, Afghanistan, and other nations.[7] ISIS sales of looted

---

[6]     https://www.latimes.com/opinion/story/2024-01-13/editorial-outrageous-nazi-stolen-painting-spanish-museum. *See* "Stolen Art Outrage, Court Rules Madrid Museum Does Not Need to Return Painting Stolen by Nazis," *NBC News*, Jan. 11, 2024, https://www.nbcnews.com/now/video/-u-s-court-rules-madrid-museum-can-keep-painting-stolen-by-nazis-201802821870.

[7] *See*, *e.g.*, Yasmine Salam & Dan De Luce, "'Just the way the Nazis did': Evidence suggests Russians are stealing art from Ukraine on a World War II scale," *NBC News*, Apr. 6, 2023, https://www.nbcnews.com/news/world/russia-stealing-art-ukraine-nazi-level-world-war-2-rcna77879; Jeffrey Gettleman & Oleksandra Mykolyshyn, "As Russians Steal Ukraine's Art, They Attack Its Identity, Too," *N.Y.*

Syrian antiquities have been reported as its second-largest source of funding for terrorism.[8]  Putin's agents will now understand they can liquidate Ukraine's stolen patrimony to buyers in Spain who can gain good title in a few years.

## II.   The Decision Misapplies California's Choice-of-Law Principles and Requires Correction to Avoid Manifest Injustice

Under California's "governmental interests" test for choice-of-law, when two jurisdictions have an interest in applying their own conflicting laws, a court must analyze the "comparative impairment" that each jurisdiction would suffer by application of the other jurisdiction's law.  It must "carefully evaluate[] and compare[]" the "nature and strength" of the respective laws, policies, and interests to "determine which jurisdiction's interests would be more severely impaired" if not applied "in the *particular context presented by the case*." *Kearney v. Salomon Smith Barney, Inc.,* 39 Cal.4[th] 95, 100, 107–08 (2006).

---

*Times*, Jan. 14, 2023, https://www.nytimes.com/2023/01/14/world/asia/ukraine-art-russia-steal.html.

[8] Joe Parkinson, et al., "Syrian 'Monuments Men' Race to Protect Antiquities as Looting Bankrolls Terror," *Wall. St. Journal*, Feb. 10, 2015, https://www.wsj.com/articles/syrian-monuments-men-race-to-protect-antiquities-as-looting-bankrolls-terror-1423615241.

A. **California's Laws, Policies, and Interests Clearly Outweigh Those of Spain in the Particular Context of this Case**

***California Law.***  Under California law, a thief cannot convey good title to stolen property, and subsequent purchasers of stolen property cannot obtain good title as long as the victim seeks recovery within the statute of limitations.  In 2010, the California Legislature amended CCP §338(c)(3) to clarify and strengthen the rights of art theft victims.  The statute authorizes filing of "an action for the specific recovery of a work of fine art brought against a museum, gallery, auctioneer, or dealer...within six years of the *actual discovery* by the claimant…of…(i) The identity and the whereabouts of the work of fine art…[and] (ii) Information or facts that are sufficient to indicate that the claimant has a claim for a possessory interest in the work of fine art." §338(c)(3)(A).

The crux of the 2010 statute is its confirmation that the "actual knowledge" trigger for the limitations period applies under California law.  Indeed, the Legislature expressly rejected "constructive knowledge imputed by law."[9]  One purpose of confirming the actual knowledge standard was to overrule cases that applied constructive knowledge, specifically including this Court's *Von Saher v.*

---

[9] "Actual discovery…does not include constructive knowledge imputed by law." §338(c)(3)(C)(i).

11

*Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010).[10]  As the legislative history explains: "The imputation of "constructive" discovery' – which may be appropriate in other contexts – does not lead to equitable results when works may be displayed anywhere in the world and traffickers engage in purposeful concealment." SER-36.  Moreover, the statute was expressly intended to reaffirm the State's commitment "to the rule that a thief cannot convey good title, and that stolen art should be returned to its rightful, original owner." SER-40.

**Federal Law and Policy**.  In the HEAR Act in 2016, citing California's law, Congress unanimously adopted a national six-year statute of limitations based on actual discovery for claims to recover Nazi-looted art. Pub.L.No. 114-308, 130 Stat. 1524 (2016); *Cassirer III*, 862 F.3d at 959–61.  The HEAR Act's "purpose…is to open courts to claimants to bring covered claims and have them resolved on the merits." S.Rep.No. 114-394, 2016 WL 7156565, at *9.  Under the Supremacy Clause, California's interests for choice-of-law purposes encompass the HEAR Act, in addition to multiple laws, international agreements and policies "to facilitate the return of…works of art" that were "confiscated…during the period of Nazi rule."

---

[10] *See* SER-39 (Report of Assembly Judiciary Comm.); SER-44–45 (Report of Senate Judiciary Comm.) (approving holdings in *Naftzger* and *Solomon R. Guggenheim Found. v. Lubell,* 550 N.Y.S. 2d 618 (N.Y.App.Div. 1990), which apply "actual discovery").

*See* HEAR Act §2(4); Holocaust Victims Redress Act, Pub.L.No. 105-158, §202, 112 Stat. 15 (1998) ("HVRA"); *infra* at Section III.

**Spanish Law.**  By contrast, Article 1955 of the Spanish Civil Code, adopted in 1889, is a rule of "acquisitive prescription" or "adverse possession."  It grants clear title to the possessor of any chattel upon "(1) 'three years of uninterrupted possession in good faith,' or (2) 'six years of uninterrupted possession, without any other condition'" (*i.e.*, notwithstanding bad faith). *Cassirer VII*, 89 F.4th at 1235.  In contrast to California (and U.S.) law, it grants good title even when the true owner has no knowledge of the work's whereabouts and therefore could not have made a claim.  It is based on the irrebuttable presumption, rejected by California, that the rightful owners of artworks have *constructive* knowledge of the holder's possession, even when they lack *actual* knowledge.

**Spain's Adoption of International Agreements that Are Consistent with California Law.**  Spain, like the United States, has adopted multiple international agreements that call for nations to return Nazi-looted artworks to the rightful owners, and to resolve disputes "on the facts and merits," not technical defenses such as the passage of time.[11]  Spain adopted these formal pronouncements of policy in recent

---

[11] *See, e.g.*, Convention on Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (UNESCO 1970); Washington Conference Principles on Nazi-Confiscated Art, U.S. DEP'T OF STATE (Dec. 3, 1998); Terezin Declaration on Holocaust Era Assets and Related Issues,

decades, a century or more after it enacted Article 1955's sweeping adverse possession rule.

Although the same Panel previously found that the international agreements are not legally enforceable, *Cassirer IV*, 824 F.App'x at 457 n.3, it never addressed their significance under California's comparative impairment test. Under that test, the question is what Spain's *interests and policies* are. In that regard, Spain at best speaks out of both sides of its mouth. Article 1955 disregards the rights of Holocaust victims in determining ownership, while Spain's international commitments recognize the victims' protected status. These agreements are duly authorized embodiments of Spanish government policy, adopted as recently as 2019 and as such represent Spain's interests. Given Spain's conflicting expressions of policy, the impairment of Spain's interests if the Painting is returned is neutral at most, and is outweighed by California's comprehensive and updated laws uniformly protecting lawful owners' rights.

***California's Interests Are Comparatively More Impaired***. Properly assessed under California's choice-of-law framework, application of Spanish law in this case

---

U.S. DEP'T OF STATE (June 30, 2009); Parliamentary Assembly of the Council of Europe, Resolution 1205 of November 4, 1999; Vilnius Forum on Holocaust Era Looted Cultural Assets, Declaration of October 5, 2000; European Parliament Resolution of December 17, 2003; Regulation (EU) 2019/880 of the European Parliament and of the Council of 17 April 2019. The forceful language endorsed by Spain in these measures appears in D.E. 86 at 25–27.

causes absolute and irreparable harm to California's interests, whereas application of California law would have, at most, a net neutral impact on Spain's policies and interests.

Even then, the Decision's appraisal of Spain's interests is vastly overstated. The "particular context" of this case, *Kearney*, 39 Cal.4th at 100, is limited to Nazi-looted art. Application of California law in this context would presumably affect barely a handful, if any, other artworks in Spain. Application of California law would have *zero* impact on the billions of other sales transactions every year in Spain to which Article 1955 would continue to apply. Any impairment of Spain's interests would be negligible.

### B. The Decision Fails to Apply the Rule that the Proponent of Foreign Law Bears the Burden to Overcome the Presumption that California Law Applies

The Decision ignores California law's requirement that the party seeking application of foreign law has the burden to show a compelling reason to do so:

> It is *Defendant's* burden to defeat the presumption that California law applies and to "show[] a compelling reason justifying displacement of California law."… Defendants can only meet this burden by engaging in an analytically rigorous discussion of each prong of California's "governmental interests" test based on the facts and circumstances of *this* case, and *this* Plaintiff's allegations.

*Forcellati v. Hylands, Inc.*, 876 F.Supp.2d 1155, 1160–61 (C.D. Cal. 2012) (court's emphasis). *See Washington Mut. Bank, N.A. v. Superior Court*, 24 Cal.4th 906, 921 (2001) (proponents "shoulder the burden of demonstrating that foreign law, rather

15

than California law, should apply"); *Kasel v. Remington Arms Co.,* 24 Cal.App.3d 711, 731 (1972) ("The law of the forum 'will be displaced only if there is a compelling reason for doing so.'").

The Decision erred in failing to impose on TBC the burden to compellingly show, "in the particular context presented by the case," *Kearney*, 39 Cal.4th at 100, that Spain's interests are more impaired than California's if Spanish law is not applied. TBC cannot meet that burden.

**C.** **The Decision Incorrectly Applies California's Comparative Impairment Test**

The Decision fails to address several of the relevant comparative impairment factors and misapplies those it does address.

### 1. *Whether the laws are directed specifically at the question at issue, or are general in nature*

The comparative impairment test favors the law of the jurisdiction whose "*actual interests*" are more specifically impaired by application of the other jurisdiction's law to "the *particular issue* presented to the court." *Kasel*, 24 Cal.App.3d at 730. The Decision ignores that §338(c)(3) is specifically and directly applicable to the facts of this case – a claim to recover stolen art against a museum – whereas Article 1955 is a general law of acquisitive prescription.

16

In *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 563 (9th Cir. 2020), this Court chose Japan's tailored law limiting liability for nuclear accidents over California's general product liability law:

> Japan made a conscious decision to encourage nuclear power in Japan. It balanced "providing protection for injured parties" with "contributing to the sound development of nuclear reactor operations."… Japan's Compensation Act is directed specifically at accidents at a nuclear facility; California's products liability rules are general in nature and presumably cover everything from toasters to airplanes.

Here, CCP §338(c)(3) specifically addresses the precise claim at issue, *i.e.*, "the particular issue presented to the court" – recovery of stolen art from a museum – while Article 1955 does not. Because Article 1955 sweepingly "cover[s] everything from toasters to airplanes," failure to apply California law more severely impairs California's interests.

### 2. *Failure to address facts of this case in balancing interests*

In determining choice-of-law, the Decision ignores the critical importance of CCP §338(c)(3) and the policies it embodies.

The California Attorney General's amicus briefs demonstrate that California's interests would be more substantially impaired by application of Spanish law than the reverse:[12]  "California enacted Section 338(c)(3)(A) to address the unique and vexing problem facing victims of stolen art that had fallen into the hands of

---

[12] The Attorney General filed amicus briefs in 2012, 2016, 2022, and 2023 supporting the validity and applicability of §338(c)(3).

museums." Brief of Amicus Curiae State of California, D.E. 97 at 12. Additionally, "using adverse possession to strip the heirs of Holocaust survivors of art Nazis took by force flies in the face of overwhelming state, federal, and international policy supporting its return." *Id.* at 8–9.

Rather than meaningfully weighing these concerns, the Decision posits a factual scenario that is flatly inconsistent with "the particular context presented by the case," *Kearney*, 39 Cal.4th at 100. It addresses a hypothetical plaintiff's failure to file within §338(c)(3)'s limitations period of six years from actual discovery. *Cassirer VII*, 89 F.4th at 1244–45. The Decision found that "because California protects the victim only if a timely suit is filed," "applying Spanish law would only partially undermine California's interests." *Id.* But with respect to "the particular issue presented in this case," Claude Cassirer *did* timely file within six years. *Cassirer III*, 862 F.3d at 965. By the Decision's own logic, "failure to apply California's laws" will "*absolutely undermine California's interest in returning stolen art to victims of theft.*" 89 F.4th at 1245.

### 3. *Whether the laws are archaic and isolated or align with modern legal trends*

The Decision failed to correctly apply California's comparative impairment analysis where the laws involve changing policy priorities: "If one of the competing laws is archaic and isolated…, it may not unreasonably have to yield to the more prevalent and progressive law, other factors of choice being roughly equal."

18

*Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal.3d 157, 165 (1978); *accord Kearney*, 39 Cal.4th at 124–25. Rather, the Decision favored Article 1955, although it is archaic, isolated, and does not align with modern legal trends concerning the "particular issue" of Nazi-looted art.

The Decision ignores that California amended §338(c)(3) in 2010, when the Legislature reiterated legal rules supporting stolen art claimants. That law is a "*balanced response* to the issue of stolen art" – the "particular context" here – which establishes "a comprehensive framework that thieves cannot pass good title, that owners of stolen art have the opportunity to file claims timely using an 'actual discovery' standard," and museum defendants "may raise 'all equitable and legal affirmative defenses and doctrines, including, without limitation, laches and unclean hands.'" California Amicus Brief, D.E. 97 at 11–13 (quoting CCP §338(c)(5)). *See Kearney*, 39 Cal.4th at 125–26 (California interests would be "significant[ly] impair[ed]" were its law not applied, where recent statutory amendments showed "strong and continuing interest in the full and vigorous application of" privacy protections for California residents).

By contrast, Spain's one-sentence general law of adverse possession has never been changed since 1889, despite Spain's adoption of the 1899 Hague Convention prohibiting pillage and seizure of works of art, and of subsequent international agreements (as recently as 2019) calling for the return of Nazi-looted art. Moreover,

19

unlike other relevant European jurisdictions, only Spain recognizes good title in the hands of a bad faith possessor. D.E. 26 at 22 n.13.[13] "Here, it is California's law that is more contemporary and more aligned with the laws of other jurisdictions." D.E. 97 at 7.[14]

The Decision attempts to avoid these unfavorable comparisons by wrongly asserting that TBC's title resulted from its possession of the Painting "*in good faith*" for *three years*. *Cassirer VII*, 89 F.4th at 1229 n.3, 1233, 1238. However, the record precludes any finding of TBC's supposed "good faith," which must exist to support the three-year period.[15] Rather, the district court found, and this Court affirmed, that "the Baron did not possess the Painting in good faith and thus…did not acquire good

---

[13] *See* German Civil Code (BGB) §932 (https://www.gesetze-im-internet.de/englisch_bgb/englisch_bgb.html#p3791); Swiss Civil Code (ZGB) Arts. 3(2), 728 (ER-0022–23) (https://www.fedlex.admin.ch/eli/cc/24/233_245_233/en).

[14] The Decision also misconstrues *Offshore Rental* as pertaining only to the "relative commitment" of each jurisdiction to the laws in question, finding this factor favors neither side. 89 F.4th at 1238. But the *Offshore Rental* analysis clearly encompasses whether the law is out of step with modern legal trends. *See, e.g., Hill v. Novartis Pharm. Corp.*, 2012 WL 967577, at *5–6 (E.D. Cal. Mar. 21, 2012).

[15] Throughout the case's prior history, the findings as to TBC's title have been based on the *six-year* period and never relied on three years of good faith possession. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F.Supp.3d 1148, 1162–63 (C.D. Cal. 2015) (TBC "acquired ownership under the longer six-year time period"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413, at *22 (C.D. Cal. Apr. 30, 2019), *aff'd, Cassirer IV*, 824 F.App'x at 457.

title to the Painting under Swiss law." 2019 WL 13240413, at *19.[16]  The district

court further found that TBC knew about the identical "red flags" of theft that

precluded the Baron's good faith.[17]  TBC's title was deemed valid only because,

while TBC may have been "irresponsible" in its actions, it lacked "actual

knowledge" of theft sufficient to be deemed an *encubridor* under Spanish law. *Id*. at

*22.  Not only was there no finding of TBC's good faith, but the clear implication is

---

[16] The district court found multiple "red flags" of Nazi looting, which the Baron failed to investigate:

> [T]he Court finds that the following circumstances, when considered together, should have caused the Baron, a sophisticated art collector, to conduct additional inquiries:  (1) the presence of intentionally removed labels and a torn label demonstrating that the Painting had been in Berlin; (2) the minimal provenance information provided by the Stephen Hahn Gallery, which included no information from the crucial World War II era and which, contrary to the partial label, did not show that the Painting had ever been in Berlin or Germany; (3) the well-known history and pervasive nature of the Nazi looting of fine art during the World War II; and (4) the fact that Pissarro paintings were often looted by the Nazis.

2019 WL 13240413, at *16.  As "a sophisticated art collector, [the Baron] would have recognized and understood the suspicious circumstances surrounding the Painting." *Id*. at *17.

[17] The district court found that TBC was aware of the following "red flags:" "the intentionally removed labels, the minimal provenance information provided, the partial label demonstrating that the Painting had been in Berlin, and the fact that Pissarros were frequently the subject of Nazi looting." 2019 WL 13240413, at *22.  In affirming, the Panel said nothing about TBC's good faith, and observed "there is evidence in the record that suggests TBC had actual knowledge that the Painting was stolen." *Cassirer IV*, 824 F.App'x at 457.

that TBC acted irresponsibly and in bad faith.  The Panel's inconsistent prior rulings and the Decision's unsupported reliance on the three-year good faith prescription period necessitate en banc review.

### 4.  The Painting's location is a neutral factor in California choice-of-law

*Cassirer VI* recognized that the "factors identified in" choice-of-law cases involving personal injuries "are not readily applicable" to determining title to stolen property. 69 F.4th at 557.  Nevertheless, the Decision discusses these personal injury and product liability cases at length and gives them substantial weight because "the relevant conduct, TBC's purchase of the Painting and its display in the museum, occurred in Spain." *Cassirer VII,* 89 F.4th at 1238–43, 1242 (cleaned up).  However, in "the particular context presented by [this] case," *Kearney*, 39 Cal.4th at 100, the factual differences in the cited cases render them largely irrelevant in this regard.

**First**, unlike the Cassirers, who have *no contact* with Spain beyond seeking the Painting's return, the plaintiffs in *all* the cited cases were physically present in the *non-California* jurisdiction when injured or exposed to toxins, and whose law was ultimately applied. *See McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 97 (2010) (asbestos exposure "occurred in Oklahoma…when plaintiff was present in Oklahoma and was an Oklahoma resident"); *Offshore Rental*, 22 Cal.3d at 169 ("[b]y entering Louisiana, plaintiff 'exposed (it)self to the risks of the territory'"); *Castro v. Budget Rent-A-Car Sys., Inc.*, 154 Cal.App.4th 1162, 1182 (2007) (same with

respect to "driving in Alabama"); *Cooper*, 960 F.3d at 563 (plaintiffs were working in Japan when exposed to hazardous materials from nuclear disaster there).

These inapposite scenarios do not support application of Spanish law. "Merely citing other courts' choice-of-law analyses, based on the facts before those courts, fails to discharge Defendants' burden of showing a 'compelling reason' justifying displacement of California law." *Forcellati*, 876 F.Supp.2d at 1161.

***Second***, relying on *McCann*, the Decision dismisses California's connection to the Painting as "rest[ing] solely on the fortuity that Claude Cassirer moved to California in 1980." *Cassirer VII*, 89 F.4th at 1242. This argument is wrong for at least two reasons.[18] First, as noted, the plaintiff in *McCann* moved to California years *after* his alleged exposure in Oklahoma. However, Claude Cassirer moved to California in 1980 – long *before* TBC acquired the Painting in 1993 and refused to return it in 2000. In other words, the conduct on which the Decision focuses occurred while Claude was a California resident, and the State has a direct interest in protecting his ownership rights.

---

[18] Indeed, Chief Justice Roberts rebuffed TBC's argument that "[b]ut for the fact that Mr. Cassirer chose to retire to California, we now have a…different outcome." The Chief Justice said: "Welcome, welcome to the United States. That's how the courts work. And a private citizen of the United States moves from New York to Ohio, the law that applies to him is going to change as well." Transcript of Oral Argument at 50–51, *Cassirer V*. Further, the record shows that New York and Ohio, Claude's prior residences, would require return of the Painting. D.E. 10 at 40.

Moreover, Spain's connection to the Painting is equally "fortuitous." "[T]he Painting originally was taken under duress in Germany, trafficked through California, held in Missouri, trafficked through New York, held in and trafficked through Switzerland, and then, finally, arrived in Spain four decades after the initial theft." California Amicus Brief, D.E. 97 at 6. The Spanish connection arose "fortuitously" from the Baron's 1985 marriage to his fifth wife,[19] who was a former Miss Spain. 7-ER-1451–52. As the Attorney General concludes: "California and Spain are similarly situated regarding the location of the wrong." *Id.* Equipoise on this factor means that TBC has failed to show a compelling reason to displace the default substantive law of California. *See Kasel*, 24 Cal.App.3d at 731; *Forcellati*, 876 F.Supp.2d at 1161.

**Third,** the Decision ignores the intent of the Legislature (and Congress) to apply the recently-adopted statutes to artworks wherever located. There was wide publicity in the early 2000's concerning the challenges of litigation seeking return of Nazi-looted artworks from Europe. *See, e.g., Republic of Austria v. Altmann*, 541 U.S. 677 (2004), depicted in *Woman in Gold* (BBC Films 2015); HEAR Act, §2(7) ("a Federal law is necessary to ensure that claims to Nazi-confiscated art are adjudicated in accordance with United States policy as expressed in" the Washington

---

[19] That is, *after* the Baron's bad faith purchase of the Painting and Claude's settling in California.

24

Principles, Terezin Declaration, and HVRA); SER-40 (California Legislature found that "stolen art is not like other kinds of property, especially given that such thefts are often accompanied by deliberate efforts to conceal the work and its provenance"). Thus, the laws were enacted knowing that all Holocaust-era thefts occurred in Europe and many artworks remained overseas, while nothing limits the laws to works physically present in California (or the U.S. So long as the defendant is subject to personal jurisdiction, as TBC is based on its extensive commercial and marketing activities, *see Cassirer I*, 616 F.3d at 1032–34, California (and the U.S.) has a strong interest in applying its laws to protect its residents.

### 5. *The maximum attainment of underlying purpose by all governmental entities is achieved by applying California law*

"Another chief criterion in the comparative impairment analysis is the 'maximum attainment of underlying purpose by all governmental entities.'" *Offshore Rental*, 22 Cal.3d at 166. This "necessitates identifying the focal point of concern of the contending lawmaking groups and ascertaining the Comparative pertinence of that concern to the immediate case." *Id*.

The Decision interpreted this element to mean that "[a] state's laws can more readily be discarded if the failure to apply its laws would only partially—rather than totally—impair" its interests. *Cassirer VII*, 89 F.4th at 1244. As noted above, Section I.C.2, the conclusion of "partial" interference is possible only by relying on a counterfactual hypothetical. The Decision never addresses the fundamental policy

25

difference that California requires actual knowledge, while Spain presumes constructive knowledge. California's interests cannot be reconciled with Spain's in this case because Claude Cassirer sued within California's (and the HEAR Act's) actual notice period. In this "immediate case," the impairment of California's interest is total, not partial.

Conversely, notwithstanding Spain's general interest in protecting expectations of buyers of movable property, Spain equally has expressed its interest, though multiple international agreements, in vindicating the rights of Holocaust victims to recover looted artworks. Section I.A *supra*. Applying California law would serve the latter interest, so Spain's overall policy interests would be only partially impaired at most.

Finally, the Decision's evaluation of Spain's interests under Article 1955 is greatly exaggerated. Application of California law *in this particular case* would have no impact whatever on certainty of title in all of the *billions* of other sales transactions in "everything from toasters to airplanes" governed by Article 1955. California law would apply only to the vanishingly small number of transactions in which a museum or art dealer acquires Nazi-looted art and is subject to California jurisdiction. Any such impairment of Spain's interests is truly *de minimis*.

### III. The Decision Overlooks or Misapprehends Matters of Federal Law that Must Be Considered in Applying California Choice-of-Law

Under the Supremacy Clause, California's interests for choice-of-law purposes necessarily encompass Federal laws, international agreements, and policies protecting the rights of the true owners of Nazi-looted art. *See Testa v. Katt*, 330 U.S. 386, 391 (1947); *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1879) (The "laws…of the United States are as much a part of the law of every State as its own local laws and Constitution."). Accordingly, the Constitution requires that in addressing the *Kearney* factors, these federal interests must be weighed.

Among these federal interests is the HEAR Act, which mirrors CCP §338(c)(3) and established a national six-year statute of limitations for claims to recover Nazi-looted art, commencing upon the true owner's "actual discovery." HEAR Act §5(a). Its "purpose…is to open courts to claimants to bring covered claims and have them resolved on the merits." S.Rep.No. 114-394, 2016 WL 7156565, at *9.

Indeed, the HEAR Act by its express terms precludes enforcement in a U.S. court of Spain's law of acquisitive prescription. The HEAR Act's six-year discovery rule applies "notwithstanding…any defense at law relating to the passage of time." §5(a). On its face, Article 1955 is a "defense at law relating to the passage of time" because TBC claims superior title to the Cassirers (who are otherwise the rightful owners), based solely on the "passage" of three or six years. Under the plain

27

meaning of the HEAR Act, the Act's six-year discovery rule applies "notwithstanding" TBC's Article 1955 defense. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) ("We interpret this language according to its 'ordinary, contemporary, common meaning.'").[20]

The HEAR Act also further effectuated the HVRA, in which Congress found that Holocaust art thefts violate the 1907 Hague Convention (IV), a treaty which U.S. courts must apply under the Supremacy Clause. *See* HEAR Act §2(7); HVRA §§201–202.[21] The HVRA provides: "[C]onsistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of…works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner." §202. Accordingly, it is the formal policy of the

---

[20] In *Cassirer III*, 862 F.3d at 965, the Panel, without formal briefing, concluded that the HEAR Act's effect was limited to extending the statute of limitations, and that it did not bar TBC's Article 1955 defense. That misreading of the Act's plain meaning was clear legal error which the Court should correct.

[21] The HVRA references Articles 47 and 56 of the 1907 Hague Convention Regulations, which include that "legal proceedings" should be instituted to redress seizures of artworks. In 1900, eleven years after enacting Article 1955, Spain ratified the 1899 version of the Hague Convention, which contains identically-worded Articles 47 and 56. https://ihl-databases.icrc.org/en/ihl-treaties/hague-conv-ii-1899/state-parties?activeTab=undefined.

U.S., and of California, to facilitate return of Nazi-looted art where, as here, undisputed proof shows the Cassirers are the rightful owners.

Other U.S. laws and policies render transfers of the Painting illegal, and also constitute California law. For example, the Painting was transferred from Germany to a California dealer in 1951. Military Law No. 52, then applicable in occupied Germany, declared "null and void" any transfer without a license of artworks seized by the Nazis; and prohibited "any transfer, contract or other arrangement made…with the intent to defeat or evade…the restitution of any [such] property to its rightful owner." 12 Fed.Reg. 2189, 2196 §3.15 (Apr. 3, 1947). Although discovery revealed art dealers' receipts and ledgers relating to the Painting, there was no license for its transfer. California has a strong interest in rectifying smuggling activity, which further refutes the purported "fortuity" of California's interests.[22]

In sum, Federal law and international obligations of the United States are part of and add great weight to California's interests in the choice-of-law analysis. These interests far outweigh those of Spain in enforcing Article 1955, particularly in light

---

[22] Additional applicable laws and policies are discussed in Plaintiffs-Appellants' Supplemental Brief, D.E. 86 at 21, 25–27, and the leading case of *Menzel v. List*, 267 N.Y.S.2d 804, 816–20 (N.Y.Sup.Ct. 1966) (quoting, *inter alia*, Military Law No. 59: "Provisions of law for the protection of purchasers in good faith which would defeat restitution [of Nazi confiscations] shall be disregarded.").

of Spain's endorsement of many international agreements that protect Holocaust victims.

## CONCLUSION

For the foregoing reasons, the petition for rehearing and rehearing en banc should be granted.

Dated:    February 22, 2024                    Respectfully submitted,

                                               /s/ *David Boies*

DAVID A. BARRETT                               DAVID BOIES
BOIES SCHILLER FLEXNER LLP                     BOIES SCHILLER FLEXNER LLP
55 Hudson Yards                                333 Main Street
New York, NY 10001                             Armonk, NY  10504
Tel:  (212) 446-2300                           Tel:  (914) 749-8200
Fax: (212) 446-2350                            Fax: (914) 749-8300

SAMUEL J. DUBBIN, P.A.                          LAURA W. BRILL
DUBBIN & KRAVETZ, LLP                           KENDALL BRILL & KELLY LLP
1200 Anastasia Avenue, Suite 300                10100 Santa Monica Blvd., Suite 1725
Coral Gables, FL 33134                          Los Angeles, CA  90067
Tel:  (305) 371-4700                            Tel:  (310) 556-2700
Fax: (305) 371-4701                             Fax: (310) 556-2705

BENJAMIN P. SOLOMON-SCHWARTZ                     STEPHEN N. ZACK
BOIES SCHILLER FLEXNER LLP                       ANDREW S. BRENNER
1401 New York Avenue, NW                         BOIES SCHILLER FLEXNER LLP
Washington, DC  20005                            100 S.E. 2nd Street, Suite 2800
Tel:  (202) 237-2727                             Miami, FL 33131
Fax: (202) 237-6131                              Tel:  (305) 539-8400
                                                 Fax: (305) 539-1307

*Counsel for Plaintiffs-Appellants*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Jaquelyn R. Levesque*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**Form 11. Certificate of Compliance for Petitions for Rehearing/Responses**

**9th Cir. Case Number(s)** 19-55616 _____

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[ x ] Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** ___6,762_____.

*(Petitions and responses must not exceed 4,200 words)*

Plaintiffs-Appellants' Motion For Leave To File Oversized Petition For Rehearing and Rehearing En Banc is being filed concurrently with this Petition.

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** __/s/ *David A. Barrett*_____ **Date** _____February 22, 2024_____

*(use "s/[typed name]" to sign electronically-filed documents)*

32

# Exhibit 1

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DAVID CASSIRER; THE ESTATE OF AVA CASSIRER; UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY, a California non-profit corporation, | No.19-55616 |
| | D.C. No. 2:05-cv-03459-JFW-E |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| THYSSEN-BORNEMISZA COLLECTION FOUNDATION, an agency or instrumentality of the Kingdom of Spain, | |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted December 12, 2022
Pasadena, California

Filed January 9, 2024

Before:  Consuelo M. Callahan, Carlos T. Bea, and Sandra
S. Ikuta, Circuit Judges.

Opinion by Judge Bea;
Concurrence by Judge Callahan

## SUMMARY[*]

### Foreign Sovereign Immunities Act

On remand from the United States Supreme Court, the panel affirmed the district court's judgment in favor of the Thyssen-Bornemisza Collection, an instrumentality of the Kingdom of Spain, in an action under the Foreign Sovereign Immunities Act, seeking the return of a Pissarro painting stolen by the Nazis in 1939 Germany.

The Supreme Court vacated the panel's prior decision and remanded with instructions to apply California's choice-of-law rules, rather than federal choice-of-law rules, to determine whether California law or Spanish law governed the disputed claim of title to the painting.  Under California law the plaintiffs would recover the art, while under Spanish law they would not.

Applying California's choice-of-law test, the three-step "governmental interest analysis," the panel first reaffirmed its prior decision, in which it determined, under Steps One and Two of the test, that the applicable laws of California

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

and Spain differed and that a true conflict existed with respect to each jurisdiction's interests in applying its laws to this case. Addressing Step Three of California's test, the so-called "comparative impairment" analysis, the panel resolved the conflict by applying the law of the jurisdiction whose governmental interests would be the more impaired were its law not applied. The panel concluded that, under the facts of this case, Spain's governmental interests would be more impaired by the application of California law than would California's governmental interests be impaired by the application of Spanish law. Thus, Spanish law must apply.

Applying Spanish law, the panel held that the Thyssen-Bornemisza Collection had gained prescriptive title to the painting pursuant to Article 1955 of the Spanish Civil Code. The panel therefore affirmed the district court's order granting judgment in favor of the Thyssen-Bornemisza Collection.

Concurring, Judge Callahan wrote that she agreed with the result, but it was at odds with her moral compass, and Spain should have voluntarily relinquished the painting.

4 CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

## COUNSEL

David Boies (argued), Boies Schiller Flexner LLP, Armonk, New York; David A. Barrett, Boies Schiller Flexner LLP, New York, New York; Stephen N. Zack, Andrew S. Brenner, and Rossana Baeza, Bois Schiller Flexner LLP, Miami, Florida; Laura W. Brill and Nicholas Daum, Kendall Brill & Kelly LLP, Los Angeles, California; Samuel J. Dubbin, Dubbin & Kravetz LLP, Coral Gables, Florida; Devin Freedman, Freedman Normand Friedland, Miami, Florida; for Plaintiffs-Appellants.

Thaddeus J. Stauber (argued), Sarah E. André, Aaron M. Brian, and Irene Scholl-Tatevosyan, Nixon Peabody LLP, Los Angeles, California, for Defendant-Appellee.

Patrick Byrne and Bernardo M. Cremades Roman, B. Cremades & Asociados, Madrid, Spain, for Amici Curiae Comunidad Judía de Madrid & Federación de Comunidades Judías de España.

Amelia L.B. Sargent, Willenken LLP, Los Angeles, California, for Amici Curiae Kingdom of Spain.

Benjamin Conway and Catherine Z. Ysrael, Deputy Attorneys General; Srividya Panchalam, Supervising Deputy Attorney General; Michael L. Newman, Senior Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General, Los Angeles, California; for Amici Curiae State of California.

Benjamin G. Shatz, Manatt Phelps & Phillips LLP, Los Angeles, California, for Amici Curiae 1939 Society, Bet Tzedek, Center for the Study of Law & Genocide, and Loyola Genocide Justice Clinic.

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.    5

## OPINION

BEA, Circuit Judge:

This case is before us after the United States Supreme Court vacated our prior decision. The Court remanded with instructions that we apply California's choice-of-law rules, rather than federal choice-of-law rules, to determine whether California law or Spanish law governs a disputed claim of title to a painting, the *Rue Saint Honoré, après midi, effet de pluie* (the "Painting"), by French Impressionist Camille Pissarro. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 117 (2022) ("*Cassirer V*").

In 1939 Germany, the Nazis stole the Painting from Lilly Neubauer ("Lilly"), a Jew who was attempting to flee the Nazi regime. After a series of transactions, the Painting is now in the possession of the Thyssen-Bornemisza Collection ("TBC").[1] TBC had purchased the Painting from the Baron Hans Heinrich Thyssen-Bornemisza (the "Baron") in 1993. TBC has publicly displayed the Painting at the Museo Nacional Thyssen-Bornemisza in Madrid, Spain, (the "Museum") ever since.

In 2000, Claude Cassirer, a California resident and Lilly's sole heir, learned that the Painting was on display at the Museum in Spain. In 2001, Mr. Cassirer filed a petition with TBC and Spain for the return of the Painting; that petition was denied. In 2005, Mr. Cassirer brought this suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a), in the United States District Court for the

---

[1] TBC is an instrumentality of the Kingdom of Spain.

6      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

Central District of California, seeking the return of the Painting from TBC.[2]

After nearly two decades of litigation, the disposition of this case turns on one issue: whether, under California's choice-of-law test, Spanish law or California law applies to determine ownership of the Painting. "[U]nder California law as it currently stands, the plaintiff would recover the art while under Spanish law, the plaintiff would not."[3] *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554, 564 (9th Cir. 2023) ("*Cassirer VI*") (citation and internal quotation omitted).

On remand from the United States Supreme Court, we certified to the California Supreme Court the question whether California's choice-of-law test requires application of Spain's laws or California's laws to this dispute. *Id.* at 571–72. The California Supreme Court declined to answer our certified question. Thus, responsibility falls on us to apply California's choice-of-law test—the three-step "governmental interest analysis"—to determine whether

---

[2] Claude Cassirer died in 2010. David and Ava Cassirer, his children, and the United Jewish Federation of San Diego County succeeded to his claims. Ava later died, and her estate is now a substitute plaintiff. Collectively, we refer to these plaintiffs as "the Cassirers."

[3] We discuss the relevant laws in detail below. In brief, under Article 1955 of the Spanish Civil Code, TBC has acquired prescriptive title to the Painting because it possessed the Painting in good faith for over three years before the Cassirers brought suit. In contrast, California has not expressly recognized adverse possession of personal property, and as a thief cannot pass title to anyone, including a good faith purchaser, if California law applied, TBC would not have title to the Painting. The Cassirers, as successors to Lilly Neubauer and Claude Cassirer, would have title.

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.          7

Spanish law or California law governs. *See Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 913, 922 (Cal. 2006).

Applying California's choice-of-law test, we first reaffirm our prior decision, in which we determined that the applicable laws of California and Spain differ and that a true conflict exists with respect to each jurisdiction's interests in applying its laws to this case. *Cassirer VI*, 69 F.4th at 563, 566. We then evaluate Step Three of California's choice-of-law test, the so-called "comparative impairment" analysis, under which we resolve such a conflict by applying the law of the jurisdiction whose governmental interests would be the more impaired were its law not applied. *See Kearney*, 137 P.3d at 934. We conclude that, under the facts of this case, Spain's governmental interests would be more impaired by the application of California law than would California's governmental interests be impaired by the application of Spanish law. Thus, applying California's choice-of-law test, we hold that Spanish law must apply.

Applying Spanish law, TBC has gained prescriptive title to the Painting pursuant to Article 1955 of the Spanish Civil Code. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452, 456–57 (9th Cir. 2020) ("*Cassirer IV*"). We therefore affirm the district court's order which granted judgment in favor of TBC.

## I. FACTS AND PROCEDURAL HISTORY

We discuss only the facts and procedural history relevant to our decision. A full account of this dispute is detailed in

8    CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

the earlier decisions issued by the district court, this Circuit, and the U.S. Supreme Court.[4]

## A. Lilly's Ownership of the Painting and The Theft of the Painting

Paul Cassirer, a member of a prominent German Jewish family, purchased the Painting in 1900. Lilly inherited the Painting from Paul. Lilly displayed the Painting at her home in Berlin, Germany, until 1939.

In 1939, Lilly was forced to "sell" the Painting to Jackob Scheidwimmer ("Scheidwimmer"), a Berlin art dealer. Scheidwimmer had been appointed by the Nazi government to obtain the Painting, had refused to allow Lilly to take the Painting with her out of Germany, and had demanded that she sell the Painting to him for 900 Reichsmarks (around $360 at then-prevailing exchange rates) to obtain an exit visa to England. Lilly surrendered the Painting to Scheidwimmer and the 900 Reichsmarks were deposited into a bank account that Lilly was not allowed to access. There is no dispute that the Nazis stole the Painting from Lilly.

After the Nazis forced Lilly to sell the Painting to Scheidwimmer in 1939, Scheidwimmer then forced another

---

[4] *See Cassirer v. Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010) (en banc) ("*Cassirer I*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613 (9th Cir. 2013) ("*Cassirer II*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017) ("*Cassirer III*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 824 F. App'x 452 (9th Cir. 2020) ("*Cassirer IV*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022) ("*Cassirer V*"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 69 F.4th 554 (9th Cir. 2023) ("*Cassirer VI*"); *see also Cassirer v. Thyssen-Bornemisza Collection Found.*, 153 F. Supp. 3d 1148 (C.D. Cal. 2015); *Cassirer v. Thyssen-Bornemisza Collection Found.*, 2019 WL 13240413 (C.D. Cal. Apr. 30, 2019).

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.    9

German Jewish collector, Julius Sulzbacher ("Sulzbacher"), to exchange three German paintings for the Painting. Sulzbacher was also seeking to escape Nazi Germany. After the Sulzbacher family fled Germany, the Gestapo confiscated the Painting. The exchange and the confiscation took place in Germany.

After the war, the Allies established a process for restoring property to the victims of Nazi looting, authorizing victims to seek restitution of looted property. In 1948, Lilly filed a timely claim against Scheidwimmer for restitution of, or compensation for, the Painting. In 1954, the United States Court of Restitution Appeals published a decision confirming that Lilly owned the Painting.

Lilly, Sulzbacher, and Scheidwimmer believed the Painting had been lost or destroyed during the war. In 1957, after the German Federal Republic regained its sovereignty, Germany enacted a law, the Brüg, which authorized claims for Nazi-looted property. Lilly then dropped her restitution claim against Scheidwimmer and initiated a claim against Germany for compensation for the wrongful taking of the Painting. In 1958, the parties reached a settlement agreement, which provided, in relevant part, that Germany would pay Lilly 120,000 Deutschmarks (the Painting's agreed value as of April 1, 1956), about $250,000 in today's dollars after adjusting for inflation. *See Cassirer V*, 596 U.S. at 110.

## B.  The Painting's Post-War History

After the Nazis confiscated the Painting, it allegedly was sold at a Nazi government auction in Düsseldorf, Germany. In 1943, the Painting was sold by an unknown consignor at the Lange Auction in Berlin, Germany, to an unknown purchaser for 95,000 Reichsmarks. In 1951, the Frank Perls

Gallery of Beverly Hills, California, arranged to move the Painting out of Germany and into California to sell the Painting to collector Sidney Brody for $14,850. In 1952, Sydney Schoenberg, a St. Louis, Missouri, art collector, purchased the Painting for $16,500. The Painting sat in a private collection in St. Louis from 1952–1976. In 1976, the Baron purchased the Painting through the Stephen Hahn Gallery in New York for $275,000. The Baron kept the Painting in Switzerland as part of his collection until 1992, except when it was on public display in exhibitions outside Switzerland.

In 1988, Favorita Trustees Limited ("Favorita"), an entity controlled by the Baron, and Spain reached an agreement with TBC that the Baron would loan his art collection (the "Collection"), including the Painting, to TBC, an entity created and controlled by the Kingdom of Spain. Pursuant to this agreement, Spain created TBC to maintain, conserve, publicly exhibit, and promote the Collection's artwork. Spain agreed to display the Collection at the Villahermosa Palace in Madrid, Spain, and to restore and redesign the palace as the Museum.

After the Villahermosa Palace had been restored and redesigned as the Museum, pursuant to the loan agreement, the Museum received a number of paintings from Favorita, including the Painting, and in 1992, the Museum opened to the public. Since October 10, 1992, the Painting has been on public display at the Museum in Spain.

In 1993, the Spanish government passed Real Decreto-Ley 11/1993, which authorized and funded the purchase of the Collection. Spain bought the Collection by entering into an acquisition agreement with Favorita. TBC paid Favorita and the Baron $350 million for the Collection. TBC required

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     11

the Baron to provide a $10 million, three-year *prenda*[5] of certain paintings as a security device for the Baron's performance under the terms of his agreement with TBC.

## C. Procedural History

Claude Cassirer, Lilly's sole heir, moved to California in 1980 and resided there until his death in 2010. In 2000, Mr. Cassirer learned that the Painting was in the Museum. On May 3, 2001, Mr. Cassirer filed a petition in Spain with the Kingdom of Spain and TBC, seeking the return of the Painting. In 2005, after that petition was denied, Claude Cassirer filed this action, under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a), in the United States District Court for the Central District of California, seeking the return of the Painting. The litigation noted in footnote 4, above, proceeded.

In 2015, the Cassirers moved the district court for an order declaring that the law of California, not the law of Spain, governed the merits of their action.[6] The district court

---

[5] *Prenda* means "security, surety," or "pledge" in Spanish. Oxford Spanish Dictionary 661 (3d ed. 2003).

[6] Under Article 1955 of the Spanish Civil Code, ownership in personal property vests by prescription after either (1) three years of uninterrupted possession of the property in good faith, (2) or six years of uninterrupted possession, even absent good faith. However, the six-year prescriptive period is tolled for the period during which a criminal or civil action can be brought if the possessor is a principal, accomplice, or accessory (*encubridor*) to the theft. *See Cassirer III*, 862 F.3d at 966. California, in contrast, has not specifically endorsed adverse possession for personal property, *see Cassirer VI*, 69 F.4th at 562, and allows a victim of fine art theft to recover the stolen art from a museum or similar institution so long as he brings suit to recover it within six years of his discovery of its whereabouts, regardless whether the possessor took possession of the

12      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

recognized that before making this determination, it first had to determine whether it should apply California or federal common law choice-of-law rules. *See Cassirer*, 153 F. Supp. 3d at 1154. The district court held that federal choice-of-law rules governed a case where jurisdiction is premised on the FSIA.[7] *Id*. Applying federal choice-of-law rules, the district court concluded that Spanish law applied to determine the ownership of the Painting. *Id.* at 1155.

Out of an abundance of caution, the district court also applied California choice-of-law rules and reached the same conclusion: that Spanish law applied. *Id*. at 1160. The court reasoned that the Painting "was present in California for less than a year," whereas "for more than twenty years . . . the Painting has been in the possession of an instrumentality of the Kingdom of Spain in Madrid, Spain . . . and that possession in Spain provides the basis for [TBC's] claim of ownership." *Id.* at 1155. The court concluded Spain has a "strong interest in regulating conduct that occurs within its borders," and in assuring individuals acting within its

---

property in good faith. Cal. Code Civ. Proc. § 338(c)(3)(A). Moreover, under California law, thieves cannot pass good title to anyone, including a good faith purchaser. *Crocker Nat'l Bank v. Byrne & McDonnell*, 173 P. 752, 754 (Cal. 1918).

[7] The district court's decision to apply federal-choice-of-law rules in a case arising under the FSIA was based on then-binding Ninth Circuit precedent. *Cassirer*, 153 F. Supp. 3d at 1154 (citing *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991)). The federal choice-of-law test draws from the Second Restatement. Under that approach, a court must consider a set of factors to decide which state has the "most significant relationship" to the case. Restatement (Second) of Conflict of Laws §§ 6, 222. The Second Restatement provides that, in cases of adverse possession of chattel, the local law of the state where the chattel was located at the time of transfer typically governs. Second Restatement, § 246.

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     13

borders that "their title and ownership of . . . property [is] certain," whereas "California's interest [in facilitating recovery for one of its residents] is significantly less." *Id.*

Applying Spanish law, the district court ruled that TBC was the rightful owner of the Painting, pursuant to Spain's law of acquisitive prescription,[8] as stated in Article 1955 of the Spanish Civil Code. *Id.* at 1160. The district court therefore entered summary judgment in favor of TBC. *Id.*

On appeal in this Court, consistent with our Circuit's precedent, we applied federal choice-of-law principles to conclude that Spanish property law governed this dispute.[9] *Cassirer III*, 862 F.3d at 961 (citing *Schoenberg*, 930 F.2d at 782).

Applying Spanish law, we considered whether TBC had fulfilled the requirements for ownership of the Painting set forth in Articles 1955 and 1956 of the Spanish Civil Code. *Id.* at 964–76. We explained that acquisitive prescription under Article 1955 is modified by Article 1956, which extends the period of possession necessary to vest title when the person who has possession was a principal, accomplice, or accessory (*encubridor*), *see* Oxford Spanish Dictionary 323 (3d ed. 2003), to the robbery or theft of the property at issue. *Cassirer III*, 862 F.3d at 966. We then held that there was a genuine dispute of material fact as to whether TBC knew the Painting had been stolen when TBC acquired the Painting from the Baron, and therefore whether TBC was an

---

[8] Acquisitive prescription is "a mode of acquiring ownership or other legal rights through possession for a specified period of time." *Acquisitive Prescription*, Black's Law Dictionary (11th ed. 2019). The term is synonymous with adverse possession.

[9] In so holding, we did not consider how California's choice-of-law rules applied. *See Cassirer III*, 862 F.3d at 961–64.

14      CASSIER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

*encubridor* under Article 1956. *Id.* at 975. If TBC were an *encubridor*, it would not have acquired title to the Painting through acquisitive prescription until 2019—six years after the criminal and civil limitations periods had run—long after the Cassiers brought their action in 2005. *Id*. at 966. Therefore, we reversed the district court's order which granted summary judgment in favor of TBC, and remanded for that court to consider whether TBC knew the Painting had been stolen when it acquired the Painting from the Baron. *Id.* at 981.

On remand, the district court conducted an extensive bench trial. The court concluded that TBC was not an *encubridor* under Article 1956 of the Spanish Civil Code, because TBC did not have actual knowledge that the Painting was stolen when it purchased the Painting from the Baron in 1993. *Cassirer*, 2019 WL 13240413, at *20–22. Because TBC had possessed the Painting publicly, as an owner, for over three years in good faith, the district court held that TBC had fulfilled the requirements of Article 1955 of the Spanish Civil Code and had therefore acquired prescriptive title to the Painting. *Id.* at *19. It thus entered judgment in favor of TBC. We affirmed. *Cassirer IV*, 824 F. App'x at 457.

The Cassirers petitioned the Supreme Court for certiorari on the question whether a federal court hearing state-law claims as to title of the Painting, brought under the FSIA, may apply federal common law to determine what state's substantive law governs the claims at issue, or whether the forum state's choice-of-law provisions govern. The Supreme Court granted the petition and held that the FSIA "requires the use of California's choice-of-law rule—because that is the rule a court would use in comparable private litigation." *Cassirer V*, 596 U.S. at 115. Because we had applied federal

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.       15

choice-of-law rules, the Supreme Court vacated our judgment and remanded for us to apply California's "standard choice-of-law rule." *Id.* at 117.

On remand, by majority vote of the panel, we certified the following question to the California Supreme Court:

> Whether, under a comparative impairment analysis, California's or Spain's interest is more impaired if California's rule that a person may not acquire title to a stolen item of personal property (because a thief cannot pass good title, and California has not adopted the doctrine of adverse possession for personal property), were subordinated to Spain's rule that a person may obtain title to stolen property by adverse possession.

*Cassirer VI*, 69 F.4th at 571–72.[10]

On August 9, 2023, the California Supreme Court declined to answer the certified question by a 6-1 vote. We thus resumed jurisdiction over the case. We then allowed for the filing of supplemental briefs and amici briefs. It is now our responsibility to determine whether, under California's choice-of-law test, Spain's laws or California's laws apply to determine title to the Painting.

---

[10] As described below, California's choice-of-law test involves three steps. In our order which certified the question to the California Supreme Court, we concluded that Step One and Step Two were satisfied. *Cassirer VI*, 69 F.4th at 563, 566. Thus, our certified question to the California Supreme Court involved only Step Three. *Id.* at 561.

16    CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

## II.  JURISDICTION AND STANDARD OF REVIEW

The FSIA, 28 U.S.C. § 1330(a), gave the district court original jurisdiction. We have appellate jurisdiction under 28 U.S.C. § 1291.

We review the district court's factual findings for clear error and its conclusions of law de novo. *Kohler v. Presidio Int'l, Inc.*, 782 F.3d 1064, 1068 (9th Cir. 2015).

## III.    ANALYSIS

California applies the "governmental interest approach" to resolve conflict-of-law disputes. *See McCann v. Foster Wheeler*, 225 P.3d 516, 527 (Cal. 2010). That test proceeds in three steps. At Step One, a court must determine "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Kearney*, 225 P.3d at 922. If the relevant laws are different, the court then moves to Step Two, under which it "examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* Finally, if there is a true conflict, the court at Step Three "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (quoting *Bernhard v. Harrah's Club*, 546 P.2d 719, 723 (Cal. 1976)). After conducting this analysis, the court "ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Id.*

### A. Spain's laws and California's laws differ with respect to the ownership of stolen property.

All agree that the relevant Spanish law here is Article 1955 of the Spanish Civil Code. Under that provision, title to movable goods (chattels) prescribes (is granted) to a possessor by either (1) "three years of uninterrupted possession in good faith," or (2) "six years of uninterrupted possession, without any other condition."  Spanish Civil Code Art. 1955 (English translation). As we have explained, the six-year prescriptive period is modified and extended by Article 1956. *See Cassirer III*, 862 F.3d at 966. Applying Article 1955 of the Spanish Civil Code to this dispute, we have already held that TBC gained prescriptive title to the Painting that is superior to the Cassirers' claim of title to the Painting under Spanish law. *See Cassirer IV*, 824 F. App'x at 455–57.

Meanwhile, three California laws are relevant to this case. First, unlike Spain, California has not expressly adopted a doctrine of adverse possession for personal property. *Cassirer VI*, 69 F.4th at 557, 562 (noting that California "has not adopted the Spanish rule 'that title to chattels may pass through qualified, extended possession'"); *see S.F. Credit Clearing House v. Wells*, 239 P. 319, 322 (Cal. 1925) (declining to consider whether adverse possession "should be applied to personal property").[11] Second, California employs the common law rule that

---

[11] On the other hand, one scholarly opinion suggests that California law does allow a possessor to take title to personal property by prescription. *See* 13 C. Witkin, Summary of California Law, Personal Property § 133 (11th ed. 2022) (explaining that California Civil Code Sections 1000 and 1007 "seem to establish the right to acquire title to personal property by adverse possession . . . .").

18     CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

"thieves cannot pass good title to anyone, including a good faith purchaser." *Cassirer VI*, 69 F.4th at 561 (citing *Crocker Nat'l Bank of S.F.*, 173 P. at 754). Third, § 338(c)(3)(A) of the California Code of Civil Procedure extends the statute of limitations under which a plaintiff can bring an action to recover "a work of fine art . . . against a museum, gallery, auctioneer, or dealer, in the case of an unlawful taking or theft." Although the general statute of limitations for claims involving the return of stolen property in California is three years, § 338(c)(3)(A) provides that an action must be commenced "within six years of the actual discovery" of the identity and whereabouts of the work of stolen fine art in which the claimant asserts an interest. Cal. Code of Civ. Proc. § 338(c)(3)(A).

In turn, the laws of Spain and California differ regarding the particular issue in question: the ownership of stolen art. *See Cassirer VI*, 69 F.4th at 562. Under Spanish law, a possessor of stolen property can acquire prescriptive title that is superior to the original owner's title. In contrast, under California law as it stands today, a possessor of stolen property does not acquire possessory rights to stolen property that are superior to the rights of the true owner until the statute of limitations expires. Moreover, under Cal. Code of Civ. Proc. § 338(c)(3)(A), the Cassirers would have a forum to bring their claim because Claude Cassirer brought suit in 2005, only five years after he discovered the whereabouts of the Painting in 2000. Thus, although TBC has acquired superior title to the Painting under Spanish law, it has not acquired superior possession rights to the Painting under California law. The laws of Spain and California as applied to this case, therefore, differ.

## B. There is a true conflict between Spanish law and California law.

A true conflict exists where each jurisdiction has a "real and legitimate interest in having its [laws] applied under the circumstances presented here." *McCann*, 225 P.3d at 531–32. If a jurisdiction's interests in its laws would not be served were its law applied, the court should apply the law of the jurisdiction that has a real interest in the dispute. *See, e.g.*, *Reich v. Purcell*, 432 P.2d 727, 730–31 (Cal. 1967) (holding Missouri did not have a real interest in applying its law regarding damages limitation with respect to an accident that occurred in Missouri, because the defendant was a resident of Ohio and Missouri's interest was to shield Missouri residents from liability). "Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied." *Hurtado v. Superior Ct.*, 522 P.2d 666, 670 (Cal. 1974).

We have already concluded that a true conflict exists between Spain's and California's interests in having their laws applied to this case. *Cassirer VI*, 69 F.4th at 564. "[B]oth Spain and California have a legitimate interest in applying their respective laws on ownership of stolen personal property." *Id.* The property laws of Spain and California serve each jurisdiction's real and legitimate governmental interests, both of which seek to "create certainty of title, discourage theft, and encourage owners of stolen property to seek return of their property in a timely fashion." *Cassirer III*, 862 F.3d at 964. Spanish law, for its part, "assures Spanish residents that their title to personal property is protected after they have possessed the property in good faith for a set period of time," whereas California law seeks to deter theft, facilitate recovery for victims of

20    CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

theft, and create "an expectation that a bona fide purchaser for value of movable property under a 'chain of title traceable to the thief,' . . . does not have title to that property." *Cassirer VI*, 69 F.4th at 565 (citing *Suburban Motors, Inc. v. State Farm Mut, Auto. Ins. Co.*, 218 Cal. App. 3d 1354, 1259 (1990)).

Moreover, California's 2010 enactment of § 338(c)(3)(A) evinces its "strong interest in protecting the rightful owners of fine arts who are dispossessed of their property." *Cassirer III*, 862 F.3d at 963. California has demonstrated a real interest in returning stolen art to victims of theft, such as the Cassirers.

Thus, we encounter a true conflict between the laws of Spain and California as both Spain and California have a "real and legitimate interest[]" in applying their respective laws to this dispute. *See McCann*, 225 P.3d at 531–32.

## C. Spain's governmental interests would be more impaired by the application of California law than would California's interests be impaired by the application of Spanish law.

Because such a true conflict exists, we must resolve that conflict at Step Three of California's choice-of-law test: the comparative impairment analysis. Under that analysis, we determine which jurisdiction's interest "would be more impaired if its policy were subordinated to the policy of the other state." *Offshore Rental Co. v. Cont'l Oil Co.*, 583 P.2d 721, 726 (Cal. 1978). We then apply the law of the state "whose interest would be the more impaired were its law not applied." *Id.*

As the California Supreme Court has instructed, our task in applying the comparative impairment analysis "is not to

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.      21

determine whether the [Spanish] rule or the California rule is the better or worthier rule." *See McCann*, 225 P.3d at 534; *Bernhard*, 546 P.2d at 724 (cleaned up) ("Emphasis is placed on the appropriate scope of conflicting state policies rather than on the quality of those policies."). Instead, our task is to decide, "in light of the legal question at issue and the relevant state interests at stake—which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann*, 225 P.3d at 534.

In making this determination, we are directed to measure the interests of each jurisdiction based on "the circumstances of the present case"—the facts of this *particular dispute*— not the jurisdiction's general policy goals expressed in the laws implicated. *See id*. And we do not look only to the jurisdiction's "single subject or rule of law"; rather, we must "identify the distinct state interests that may underlie separate aspects of the issue in question." *Kearney*, 137 P.3d at 924; *see, e.g.*, *Hurtado*, 522 P.2d at 672 (explaining that where a state limits damages for wrongful death actions, three distinct state interests should be evaluated under California's choice-of-law test: compensation for survivors, deterrence of conduct, and limitation, or lack thereof, upon the damages recoverable). Based on the magnitude of the distinct state interests, as derived from the facts of the present dispute, we can then compare the extent to which each jurisdiction's interests would be impaired were its law not applied. *See Kearney*, 137 P.3d at 924.

In sum, our task is to compare, under the facts of this case, (1) the extent to which Spain's interests in providing certainty of title to entities like TBC would be impaired by the application of California law, and (2) the extent to which California's interest in deterring theft and facilitating

recovery for victims of stolen art, like the Cassirers, would be impaired by the application of Spanish law.

The California Supreme Court has identified several factors to evaluate in analyzing the scope of "the distinct . . . interests" a jurisdiction has in applying its laws to a specific case. *See id.* Those factors include the "current status of a statute," *see Offshore Rental*, 583 P.2d at 726–27; the location of the relevant transactions and conduct, *see McCann*, 225 P.3d at 535–37; *Offshore Rental*, 583 P.2d at 728–29; *Kearney*, 137 P.3d at 937–38; and the extent to which one jurisdiction's laws either impose similar duties to the other jurisdiction's laws, or are accommodated by the other jurisdiction's laws, such that the application of the other jurisdiction's laws would only partially—rather than totally—impair the interests of the state whose law is not applied, *see Bernhard*, 546 P.2d at 725–26. We evaluate each factor in turn.

1.

First, we analyze whether the policy underlying a state's law "is one that was much more strongly held in the past than it is now." *Offshore Rental*, 583 P.2d at 726 (citation omitted). "[T]he current status of a statute is an important factor to be considered in a determination of comparative impairment." *Id.* If a particular statute is "infrequently enforced or interpreted even within its own jurisdiction," it has limited application in a conflict-of-laws case. *Id.*[12]

---

[12] For example, in *Offshore Rental*, the California Supreme Court considered a California cause of action for "negligent injury to a key employee" brought by a California employer against a Delaware corporation for an injury to an employee that occurred on the defendant's

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.    23

The Cassirers argue that Spain's acquisitive prescription law is archaic, and therefore should be afforded little weight, because (1) it is out of step with international consensus supporting the return of Nazi-looted art, including agreements to which Spain is a party, and (2) Spain's six-year acquisitive prescription law for property obtained in bad faith is an outlier compared to other countries. That argument fails.

First, TBC does not claim to have taken prescriptive title under Spain's six-year acquisitive prescription law, which vests title after six years regardless whether the possessor acted in good faith. *Cassirer III*, 862 F.3d at 966. Were that law applied, we previously held that, pursuant to Article 1956 of the Spanish Civil Code, TBC would not have acquired title to the Painting until 2019—six years after the criminal and civil limitations period had run—and so the Cassirers would have been entitled to the return of the Painting. *Id.* Thus, we find irrelevant the Cassirers' argument that Spain's six-year acquisitive prescription for

---

premises in Louisiana. 583 P.2d at 722. It was unclear whether § 49 of the California Civil Code recognized such an action. *Id.* at 724. The court assumed that California did recognize the action, which it reasoned "expresse[d] [California's] interest in protecting California employers from economic harm." *Id.* But in applying the comparative impairment analysis, the court discounted California's interest because it had "exhibited little concern" in applying the law. *Id.* at 728. "[N]o California court has heretofore squarely held that California law provides an action for harm to business employees, and no California court has recently considered the issue at all." *Id.* The court also reasoned that the law was "archaic and isolated in the context of the laws of the federal union." *Id* (citation and quotation marks omitted). The court thus discounted California's interest "in the application of its unusual and outmoded statute," as compared to Louisiana's more "prevalent and progressive law" that did not recognize the cause of action. *Id.*

stolen property is an "outlier compared to all of the other jurisdictions that had contact with the Painting." That provision of the law is not applicable in the "present case." *See McCann*, 225 P.3d at 534. The three-year period of Article 1955 is the basis for TBC's claim.

Second, we reiterate the California Supreme Court's directive that a court's task "is not to determine whether the [foreign jurisdiction] rule or the California rule is the better or worthier rule." *Id*. Rather, the inquiry rests on the "relative commitment of the respective states to the laws involved." *Offshore Rental*, 583 P.3d at 727. The Cassirers' argument strikes at the social worthiness of Article 1955 of the Spanish Civil Code—an invalid basis upon which to weigh the scope of Spain's interests. *See id.*

As we have recognized, "neither jurisdiction has shown any lack of interest in seeing its own law applied." *Cassirer VI*, 69 F.4th at 569. Spain has demonstrated a commitment to enforcing its acquisitive prescription laws and to legislating on the ownership of property located in its territory. *Id.* And California has asserted its strong interest in seeking justice for victims of art theft. *Id.* at 569 n.9. Both California and the Kingdom of Spain filed amicus briefs expressing their strong interests in the application of their respective laws to this dispute.

Therefore, the relative commitment of the jurisdictions to their laws as applied to this dispute does not favor or disfavor the application of either jurisdiction's laws under the comparative impairment approach.

2.

The California Supreme Court has reasoned that the place where the relevant conduct occurs receives significant

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.    25

weight in measuring the interests involved in the comparative impairment analysis. Indeed, a jurisdiction "ordinarily has the predominant interest in regulating conduct that occurs within its borders and in being able to assure individuals and commercial entities operating within its territory that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." *McCann*, 225 P.3d at 534 (cleaned up). In such a case, the jurisdiction has a strong interest in "establishing a reliable rule of law" to promote predictability, to allow actors operating within the jurisdiction's borders reasonably to rely on the jurisdiction's law, and to facilitate investment by entities operating within the jurisdiction. *Id.*; *Offshore Rental*, 583 P.2d at 728; *Kearney*, 137 P.3d at 936–37.

In turn, failing to apply a jurisdiction's laws that limit liability with respect to conduct that occurs within its borders will, typically, significantly impair a jurisdiction's real and legitimate interests in promoting reliance on its laws. *See McCann*, 225 P.3d at 534–35; *Kearney*, 137 P.3d at 936–37. This is particularly so when the failure to apply the jurisdiction's law to conduct within its borders is based solely on the fortuity of the residence or choice of tribunal of an adverse party. *See McCann*, 225 P.3d at 534–35.

In contrast, where none of the relevant conduct occurs in California, a "restrained view of California's interest" in facilitating recovery for one of its residents is warranted. *Id.* at 535. "[P]ast California choice-of-law decisions generally hold that when the law of the other state limits or denies liability for the conduct engaged in by the defendant in its territory, that state's interest is predominant, and California's legitimate interest in providing a remedy for, or in facilitating recovery by, a current California resident

26      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

properly must be subordinated because of this state's diminished authority over activity that occurs in another state." *Id.* at 536; *see also Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 560 (9th Cir. 2020) ("California's courts have frequently applied foreign laws that serve to protect businesses by limiting liability, even when applying that law precludes recovery by injured California residents.").

We find *McCann* particularly instructive here. There, a former Oklahoma resident was exposed to friable asbestos at his workplace in Oklahoma. 225 P.3d at 518. The plaintiff later moved to California and developed mesothelioma there. *Id.* Breathing in friable asbestos is a known—perhaps the only known—cause of mesothelioma. He then sued his former employer in California state court. *Id.* Oklahoma's statute of repose would have barred the suit, but California's statute of limitations would not have barred the suit. *Id*. Thus, a "true conflict" existed between California law and Oklahoma law. *Id.* at 533.

Applying the comparative impairment analysis of California's choice-of-law test, the California Supreme Court held that Oklahoma law applied and barred the plaintiff's suit. *Id.* at 537. The court concluded that "a failure to apply Oklahoma law would significantly impair Oklahoma's interest," because all relevant conduct—the exposure to the asbestos—"occurred in Oklahoma." *Id.* at 534. In so reasoning, the court stressed that a jurisdiction "ordinarily has the predominant interest in regulating conduct that occurs within its borders." *Id.*; *see also Castro v. Budget Rent-A-Car System, Inc.*, 154 Cal. App. 4th 1162, 1180 (Cal. Ct. App. 2007) (reasoning that a state has a "presumptive interest in controlling the conduct of those persons" who engage in relevant conduct in the state and that

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     27

a state has an interest in "not subjecting its residents and businesses to the laws of other states that expand liability").

Thus, applying California law would have significantly impaired Oklahoma's governmental interests in regulating conduct within its borders, because doing so "would rest solely upon the circumstance that after defendant engaged in the allegedly tortious conduct in Oklahoma, plaintiff happened to move to a jurisdiction whose law provides more favorable treatment to plaintiff than that available under Oklahoma law." *McCann*, 225 P.3d at 534.    The court reasoned:

> [T]he displacement of Oklahoma law limiting liability for conduct engaged in within Oklahoma, in favor of the law of a jurisdiction to which a plaintiff subsequently moved, would—notwithstanding the innocent motivation of the move— nonetheless *significantly impair the interest of Oklahoma* served by the statute of repose. If Oklahoma's statute were not to be applied because plaintiff had moved to a state with a different and less "business-friendly" law, Oklahoma could not provide any reasonable assurance—either to out-of-state companies or to Oklahoma businesses—that the time limitation embodied in its statute would operate to protect such businesses in the future. Because a commercial entity protected by the Oklahoma statute of repose has no way of knowing or controlling where a potential plaintiff may move in the future, subjecting such a defendant to a different rule

28      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

> of law based upon the law of a state to which
> a potential plaintiff ultimately may move
> *would significantly undermine Oklahoma's*
> *interest in establishing a reliable rule of law*
> governing a business's potential liability for
> conduct undertaken in Oklahoma.

*Id.* at 534–35 (emphases added); *see also Kearney*, 137 P.3d at 937 (explaining that "Georgia has a legitimate interest in ensuring that individuals and businesses who act in Georgia with the reasonable expectation that Georgia law applies to their conduct are not thereafter unexpectedly and unforeseeably subjected to liability for such action" and holding that "restrain[ing] the application of California law with regard to the imposition of liability for acts that have occurred in the past" was necessary "to accommodate Georgia's interest in protecting persons who acted in Georgia in reasonable reliance on Georgia law").

In contrast, the failure to apply California's statute of limitations would create "a far less significant impairment of California's interest," because none of the relevant conduct occurred in California. *McCann*, 225 P.3d at 535. Although California would not be able to "extend its liberal statute of limitations for asbestos-related injuries or illnesses to some potential plaintiffs," "California's interest in applying its laws providing a remedy to, or facilitating recovery by, a potential plaintiff in a case in which the defendant's allegedly tortious conduct occurred in another state is less than its interest when the defendant's conduct occurred in California." *Id.* In turn, "a restrained view of California's interest in facilitating recovery by a current California resident is warranted in evaluating the relative impairment of California's interest that would result from the failure to

CASSIRER v. THYSSEN-BORNEMISZA COLLECTION FOUND.     29

apply California law." *Id.*; *see also Castro*, 154 Cal. App. 4th at 444 (reasoning that a California plaintiff's "individual financial circumstance and the possible cost to California taxpayers and businesses [of an uncompensated loss] are . . . not sufficient to reallocate" lawmaking power from the jurisdiction where the conduct occurred to California).

Thus, because all relevant conduct occurred in Oklahoma—and California's only connection to the dispute was the fortuitous residence of the plaintiff in California— Oklahoma law applied under the comparative impairment analysis. *McCann*, 225 P.3d at 537.

Similarly, in *Offshore Rental*, the California Supreme Court—applying the comparative impairment approach— applied Louisiana law over California law to bar a claim by a California plaintiff relating to a physical injury that occurred in Louisiana. 583 P.3d at 728–29. There, the plaintiff, a California corporation, brought a negligence action against the defendant out-of-state corporation, seeking to recover damages that the plaintiff corporation allegedly sustained as a result of an injury that an officer of the corporation suffered while the officer was on the defendant's premises in Louisiana. *Id.* at 722. The California plaintiff (the employer) sued for the value of its lost services under a theory of "negligent injury to a key employee." *Id.* It was unclear whether California law recognized such a claim, but Louisiana law foreclosed such a claim. *Id.* at 724.

The California Supreme Court held that Louisiana law applied and barred the California plaintiff's suit, in part because the relevant conduct (the employee's injury at the defendant's workplace) occurred in Louisiana. *Id.* at 728–

29. The court affirmed the trial court's order that had dismissed the plaintiff's claim, reasoning:

> The accident in question occurred within Louisiana's borders; although the law of the place of the wrong is not necessarily the applicable law for all tort actions, the situs of the injury remains a relevant consideration. At the heart of Louisiana's denial of liability lies the vital interest in promoting freedom of investment and enterprise within Louisiana's borders, among investors incorporated both in Louisiana and elsewhere. The imposition of liability on defendant, therefore, would strike at the essence of a compelling Louisiana law.

*Id.* at 728.

Based in part on the fact that the relevant conduct occurred in Louisiana, the California Supreme Court concluded that Louisiana's interests would be the more impaired if its law were not applied and, therefore, held that Louisiana law applied. *Id.* at 728–29.[13]

In sum, California Supreme Court precedent teaches that the place in which the relevant conduct occurs in the particular case is a crucial factor in measuring the jurisdictions' relative interests under the comparative

---

[13] As explained above, *supra* note 12, the California Supreme Court also discounted California's interest because California had "exhibited little concern" for applying its outdated law. *Id.* at 728. But the fact that the accident occurred within Louisiana's borders, and not California's borders, "provide[d] additional support for our limitation of the reach of California law in the present case." *Id.*

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     31

interest analysis. This is because a jurisdiction has a strong interest in "establishing a reliable rule of law"—especially one that may limit future liability—with respect to conduct that occurs within its borders. *See McCann*, 225 P.3d at 535. Furthermore, when California's sole contact to the dispute was the happenstance of the plaintiff's residence there, California's interest in facilitating recovery for that resident was minimal and the extraterritorial reach of its laws was restrained. *See id.*

Here, as in *McCann*, California's governmental interest rests solely on the fortuity that Claude Cassirer moved to California in 1980, at a time when the Cassirer family believed the Painting had been lost or destroyed. *See McCann*, 225 P.3d at 535. Like *McCann*, none of the relevant conduct involving the Painting occurred in California.[14] *See id.* Moreover, although California has evinced a strong interest in returning stolen art to victims of theft, *see* Cal. Code Civ. Proc. § 338(c)(3)(A), a "restrained view of California's interest in facilitating recovery by a current California resident" is warranted. *See McCann*, 225 P.3d at 535 ("California's interest in applying its laws providing a remedy to, or facilitating recovery by, a potential plaintiff in a case in which the defendant's allegedly tortious conduct occurred in another state is less than its interest when the defendant's conduct occurred in California."). In sum, because no relevant conduct with respect of the Painting occurred in California, the impairment of California's interest that would result from applying Spanish

---

[14] The only conduct connected to the Painting that occurred in California involved the sale of the Painting there in the early 1950s, when the Painting was in California for around a year before its sale to a St. Louis art dealer. But the parties do not claim this sale is in any manner relevant.

32      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

law would be minimal. *See id.* Claude Cassirer's decision to move to California—a move that was unrelated to his claim for the Painting—is "not sufficient to reallocate" lawmaking power from Spain to California. *See Castro*, 154 Cal. App. 4th at 444; *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1424 (9th Cir. 1989) ("California courts have rejected arguments that a party's contacts with California, unrelated to the cause of action at hand, create a basis for extending the reach of California's law.").

In contrast, applying California law would significantly impair Spain's interest in applying Article 1955 of the Spanish Civil Code. For one, because the relevant conduct (TBC's purchase of the Painting and its display in the museum) occurred in Spain—or at least not in California[15]—*McCann* teaches that Spain has the "predominant interest" in applying its laws to that conduct. *See* 226 P.3d at 534. As *McCann* and *Offshore Rental* both make clear, when the relevant conduct occurs within a jurisdiction's borders, that jurisdiction has a strong "interest in establishing a reliable rule of law governing a business's potential liability for conduct undertaken" there. *See id.* at 535; *Offshore Rental*, 583 P.2d at 728–29 (reasoning that a jurisdiction has a "vital interest in promoting freedom of investment and enterprise within [its] borders"); *Arno v. Club Med Inc.*, 22 F.3d 1464, 1469 (9th Cir. 1994) (applying French law to a vicarious-

---

[15] Certainly, some of the Painting's history involves jurisdictions other than Spain: (1) the Nazis' theft of the Painting in 1939, in Germany, (2) the movement of the Painting into California and its sale in 1951, (3) the sale of the painting to a St. Louis, Missouri art collector in 1952, (3) the sale of the Painting to the Baron in New York in 1976, and (4) the Painting's possession and display by the Baron from 1976-1992 in Switzerland. But no one claims that Germany, Missouri, New York, or Switzerland has an interest in applying its laws here.

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND. 33

liability claim because Guadeloupe's interest in "encouraging local industry . . . and reliably defining the duties and scope of liability of an employer doing business within its borders" would be more impaired than California's interest in "providing compensation to its residents" would be impaired were its law not applied).

Moreover, applying California law based only on the Cassirers' choice of residence would mean that Spain could not provide any "reasonable assurance[s]" to persons who possess property within Spain's borders that Article 1955 would ever protect them from replevin or damages actions by California claimants. *See McCann*, 225 P.3d at 534. Rather, applying California law would mean that Spain's law would not apply to property possessed within Spain's borders, so long as the initial owner (1) happened to be a California resident (a fact over which, as in *McCann*, the defendant has "no way of knowing or controlling," *see id.* at 535), and (2) the California resident did not know where the property is located and who possessed it—contrary to Article 1955 of the Spanish Civil Code. Applying California law based only on Claude Cassirer's decision to move to California would "strike at the essence of a compelling [Spanish] law." *See Offshore Rental*, 583 P.2d at 728. And it would contradict the principles from *McCann* and *Offshore Rental*, which recognize the strong interest that Spain has in ensuring its laws will predictably regulate conduct that occurs within its borders. *See McCann*, 225 P.3d at 535 ("[S]ubjecting such a defendant to a different rule of law based upon the law of a state to which a potential plaintiff

34    CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

ultimately may move would significantly undermine Oklahoma's interest.").[16]

Finally, Spain's interests in promoting reliance, predictability, and investment are especially relevant under the facts of this case, as shown by TBC requiring the Baron to provide a three-year *prenda* specifically to align with Article 1955's prescriptive acquisition period. Applying California law to this case would leave entities in Spain, like TBC, unable to structure and plan their conduct in Spain in reliance on Spain's laws. *McCann* and *Offshore Rental* dictate that such an outcome would significantly impair Spain's governmental interests.

In sum, applying California law to this dispute would significantly impair Spain's interests, whereas applying Spanish law would relatively minimally impair California's interests.

3.

Finally, the California Supreme Court has directed that a court applying the comparative impairment analysis should strive for the "maximum attainment of underlying purpose by all governmental entities." *Offshore Rental*, 583 P.2d at 728 (reasoning that a court should look to "the function and purpose of th[e] laws"). Thus, the court should look to whether one jurisdiction's laws accommodate the other jurisdiction's interests or imposes duties the other

---

[16] We recognize that *McCann* and *Offshore Rental* involved causes of action involving bodily injury, whereas this case involves an injury that relates to property. *See Cassirer VI*, 69 F.4th at 561–62. But as in *McCann* and *Offshore Rental*, which involved tort causes of action, the Cassirers' legal interests were also invaded by tortious conduct: conversion of the Painting by the Nazis in Germany. The principles from *McCann* and *Offshore Rental* are therefore applicable here.

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     35

jurisdiction already imposes. *See, e.g.*, *Bernhard*, 546 P.2d at 724–26. A state's laws can more readily be discarded if the failure to apply its laws would only partially—rather than totally—impair the policy interests of the jurisdiction whose law is not applied. *See Offshore Rental*, 583 P.2d at 726–27. Here, the failure to apply California's laws would only partially undermine California's interests in deterring theft and returning stolen art to victims of theft, which provides further support for limiting the extraterritorial reach of California's laws to this dispute.

An example comes from *Bernhard*. There, a patron became intoxicated at Harrah's Club, a Nevada tavern located near the California border, and thereafter was involved in a car accident in California with a California resident. 546 P.2d at 720. Harrah's had advertised in California and solicited customers in California to patronize its business. *Id.* The plaintiff sued Harrah's in California state court for negligently serving alcohol to the patron. *Id*. Nevada had a law which immunized tavern keepers from civil liability for the negligent actions of their patrons, whereas California did not have a law so protecting tavern keepers. *Id*. Nevada law, however, imposed criminal liability on tavern owners who served alcohol to obviously intoxicated patrons. *Id.* at 725.

The California Supreme Court, applying the comparative impairment analysis, held that California law applied, in part because the failure to apply Nevada law would only partially undermine Nevada's interests, whereas the failure to apply California's law would significantly impede California from effectuating its policy interests in protecting against the risks of drunk driving. *Id.* at 724–26. Although the court recognized that application of California law would result in "an increased economic exposure" for Nevada tavern

keepers, it explained that "Nevada's interest in protecting its tavern keepers from civil liability of a boundless and unrestricted nature will not be significantly impaired when as in the instant case liability is imposed only on those tavern keepers who actively solicit California business." *Id.* at 725.

Moreover, the California Supreme Court noted that, since the "act of selling alcoholic beverages to obviously intoxicated persons is already proscribed in Nevada" by criminal law, application of California's rule would not impose "an entirely new duty" on Nevada tavern keepers. *Id.* Because Nevada law already contemplated that tavern keepers could be punished—albeit criminally—for serving intoxicated persons, exposing those businesses to civil liability would only partially undermine Nevada's interests. *Id.* Accordingly, the court concluded that California law should be applied. *Id.* at 725–26.

Here too, applying Spanish law would only partially undermine California's interests in facilitating recovery of stolen art for California residents. California law already contemplates that a person whose art—or other personal property—is stolen may eventually lose the ability to reclaim possession: namely, if the person fails to bring a lawsuit within six years after he discovers the whereabouts of the art. *See* Cal. Code Civ. Proc. § 338(c)(3)(A). If the victim fails to bring a lawsuit within that time, the victim loses the right of possession because he can no longer use the judicial process to enforce his ownership interest. *See, e.g.*, *Harpending v. Meyer*, 55 Cal. 555, 561 (1880) (holding that a plaintiff whose jewelry had been stolen could not recover from a third party because the statute of limitations had expired). And in such a case, as in Spain, the possessor retains possession rights as against all third parties, even if the property is stolen. *See Rosenthal v. McMann*, 29 P. 121,

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     37

121–22 (Cal. 1892) (explaining that "one having the possession, merely, is the owner as against a wrongdoer," and that possession "is presumed lawful, and as against a trespasser, even one who obtained possession wrongfully was deemed to have been lawfully possessed"); *Nat'l Bank of New Zealand, Ltd. v. Finn*, 253 P. 757, 769 (Cal. Dist. Ct. App. 1927) (noting the "general rule" is that "[a]ctual possession of a chattel at the time of its conversion will sustain trover, except as to the true owner or one claiming under him, even though the title be conceded to be in a third person" (quoting 24 Cal. Jur. § 19)); *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B. 1722) (holding that the finder and possessor of property has rights superior against all but the rightful owner).

Even under the most generous interpretation of California's no-title-passes-through-theft rule, then, certain victims of theft (i.e., those who do not bring suit to recover the chattel before the statute of limitations expires) will not prevail against subsequent possessors of the chattel. As with the risk of criminal liability for a tavern keeper under Nevada law in *Bernhard*, California law already contemplates the risk that certain victims of art theft will lose the right to reclaim property. *See Bernhard*, 546 P.2d at 725. Thus, failure to apply California's laws will not absolutely undermine California's interest in returning stolen art to victims of theft because California law protects the victim only if a timely suit is filed.

Similarly, Article 1955 of the Spanish Civil Code accommodates California's interest in deterring theft. As we have explained, Spanish law makes it more difficult for title to vest in an "*encubridor*," which includes, "an accessory after the fact," or someone who "knowingly receives and benefits from stolen property." *Cassirer III*, 862 F.3d at 968.

38      CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.

If the possessor is proven to be an *encubridor*, Spanish law extends the period in which the property must be possessed before new prescriptive title is created. *Id.* Here, had TBC been an *encubridor*, the Cassirers would have prevailed in this action because TBC would not have gained prescriptive title by the time the Cassirers brought their claim. *See Cassirer III*, 862 F.3d at 966 ("[I]f Article 1956 applies, TBC has not acquired prescriptive title to the Painting."). California's interest in deterring passage of title through theft has, at least in part, been protected.

In sum, applying Spain's laws here would only partially undermine California's interests in deterring theft and in returning stolen art to victims of theft.

## IV. CONCLUSION

We conclude that the application of California's laws would significantly impair Spain's governmental interests, whereas the application of Spain's laws would only relatively minimally impair California's governmental interests. As a result, Spain's interests would be more impaired by the application of California law than would California's interests be impaired by the application of Spanish law. Under California's choice-of-law test, then, we hold that Spanish law applies to determine ownership of the Painting. And pursuant to Article 1955 of the Spanish Civil Code, TBC has acquired prescriptive title to the Painting. *See Cassirer IV*, 824 F. App'x at 457.

We therefore affirm the district court's order which granted judgment in favor of TBC.

**AFFIRMED.**

CASSIRER V. THYSSEN-BORNEMISZA COLLECTION FOUND.     39

CALLAHAN, Circuit Judge, concurring:

Sometimes our oaths of office and an appreciation of our proper roles as appellate judges require that we concur in a result at odds with our moral compass. For me, this is such a situation. As we have previously held, the district court's "finding that the Baron lacked actual knowledge that the Painting was stolen was not clearly erroneous," and thus, "even if the Baron's knowledge could be imputed to TBC, it does not cause TBC to have actual knowledge." *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 824 F. App'x. 452, 456-57 (2020). Furthermore, I fully agree with the opinion's application of California law to the facts in this litigation and the determination that Spain's interests would be more impaired if California law were applied than California's interests would be impaired by applying Spanish law.

Nonetheless, I reaffirm the point we made in footnote three of our opinion in *Cassirer*, 824 F. App'x. at 457. Spain, having reaffirmed its commitment to the Washington Principles on Nazi-Confiscate Art when it signed the Terezin Declaration on Holocaust Era Assets and Related Issues, should have voluntarily relinquished the Painting. However, as we previously held, "we cannot order compliance with the Washington Principles or the Terezin Declaration." *Id*. Our opinion is compelled by the district court's findings of fact and the applicable law, but I wish that it were otherwise.