No. 19-55616

IN THE
UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

―――――――――――――――――――――――――――――――

DAVID CASSIRER, THE ESTATE OF AVA CASSIRER, AND
UNITED JEWISH FEDERATION OF SAN DIEGO COUNTY,
a California non-profit corporation,
*Plaintiffs-Appellants*,

v.

THYSSEN-BORNEMISZA COLLECTION FOUNDATION,
*Defendant-Appellee*.
―――――――――――――――――――――――――――――――
Appeal from the United States District Court,
Central District of California, Case No. 2:05-cv-03549-JFW-E,
Honorable John F. Walter
―――――――――――――――――――――――――――――――

**PLAINTIFFS-APPELLANTS' MOTION
TO STAY THE MANDATE**

## I. Introduction

Plaintiffs-Appellants David Cassirer, *et al*., respectfully move under Federal Rule of Appellate Procedure 41(d)(1) and Ninth Circuit Rule 41-1 for a stay of the mandate in this case pending their filing a certiorari petition in the Supreme Court to review this Court's January 9, 2024 decision. *See* D.E. 151; *Cassirer v. Thyssen-Bornemisza Collection Found.*, 89 F.4th 1226 (9th Cir. 2024) (the "Decision"). On July 9, 2024, the Court denied the Cassirers' Petition for Rehearing and Rehearing

En Banc. D.E. 175-1. The Supreme Court has already demonstrated its interest in this case by granting certiorari and unanimously reversing this Court's prior decisions applying Spanish substantive law, and directing application of California choice-of-law rules. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107 (2022) ("*Cassirer V*"). Further, there is good cause here for a stay pending a certiorari petition.

The Decision raises several substantial questions for Supreme Court review, including its failure to apply the multiple Federal laws, policies, and international agreements that address claims to recover Nazi-looted art, in violation of the Supremacy Clause. These include the Hague Convention (1907), U.S. Military Laws Nos. 52 and 59 (1947), the UNESCO Convention (1970), the Holocaust Victims Redress Act (1998), the Washington Conference Principles (1998), the Terezin Declaration (2009), the Holocaust Expropriated Art Recovery (HEAR) Act (2016), and Executive Branch actions, such as the State Department's 1949 Tate Letter, and others. *See* Pet. for Rehearing, D.E. 155 ("Pet.") at 1-4, 12-13, 24-25, 27-30; pp. 7-13 below.

The national and international legal and moral implications of this case cannot be overstated, including because there is no dispute that Lilly Cassirer owned the Pissarro masterpiece painting at issue, that it was looted by the Nazis in 1939, and

that the Supreme Court recognized its importance in its 2022 decision. *See Cassirer V*, 596 U.S. at 109-11.

As Judge Graber noted in her dissenting statement on denial of rehearing en banc, the case is "extraordinary" for its moral, legal, and international implications:

> In addition to generating significant judicial proceedings, the dispute has garnered intense media coverage and interest from all over the world. This also is the rare case that has not only a legal component, but also a moral component: Consistent with earlier statements by the district court and by the panel as a whole, Judge Callahan's concurrence states that the opinion's result is "at odds with [her] moral compass."
>
> The issue is critically important. The world is watching. We should reach the result that is both legally compelled <u>and</u> morally correct. I am deeply disappointed by this court's decision, which has the unnecessary effect of perpetuating the harms caused by Nazis during World War II.

D.E. 175-1 at 4-5 (emphasis in original) (citation omitted). She added:

> The case also has attracted unusually intense media coverage the world over. Articles have been published in essentially every major newspaper in the United States along with many smaller domestic papers, as well as publications in Spain, Germany, the United Kingdom, France, the Netherlands, Italy, Mexico, Canada, Colombia, Brazil, Argentina, Australia, New Zealand, Israel, South Africa, Hong Kong, Bangladesh, Thailand, and regional publications in Europe and Asia more generally. The media understandably have recognized the moral dimension, too, and have characterized the case as "perhaps the highest-profile case of World War II art restitution."

*Id.* at 23 (citation omitted). Judge Graber acknowledged the Federal character and issues raised by the Decision:

> [T]his case involves artwork stolen by Nazis. That distinction matters, when analyzing California's choice-of-law rules, because California

> has legislated specifically with respect to the return of artwork stolen by Nazis and because the international community, including the United States and Spain, has coalesced around the principle that artwork stolen by Nazis should be returned to the rightful owner.

*Id.* at 24.

Likewise, in two amicus briefs, the State of California recognized that choice-of-law in this case is inseparable from Federal and international law and policies: "[U]sing adverse possession to strip the heirs of Holocaust survivors of art Nazis took by force flies in the face of overwhelming state, federal, and international policy supporting its return. . . . California's interests, which Section 338(c) seeks to advance, mirror the commitments of the Federal government and international community." D.E. 97 at 8-9; *see* D.E. 137-2.

In addition to the importance of certiorari review of the case, a stay is warranted by the potential enactment, possibly within weeks, of California legislation that would affect the outcome of this case by directing the application of California substantive law to determine ownership of looted artworks. That legislation would likely obviate the need for Supreme Court review. *See* pp. 15-18 below.

## II. Standard for Granting Stay of the Mandate

Rule 41(d)(1) provides that the movant "must show that the petition [for certiorari] would present a substantial question and that there is good cause for a stay." Under the law of this Circuit, including Circuit Rule 41-1, "a party seeking a

stay of the mandate following this court's judgment need not demonstrate that exceptional circumstances justify a stay." *Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1528 (9th Cir. 1989). Rather, the Court's "general practice" is to "grant[ ] a motion for a stay if the arguments presented therein are not frivolous." *Epic Games, Inc., v. Apple, Inc.*, 73 F.4th 785, 785 (9th Cir. 2023) (Smith, J., concurring); *see U.S. v. Pete*, 525 F.3d 844, 850, n.9 (9th Cir. 2008) (it is "often the case" that the Court stays the mandate while a party seeks certiorari); Ninth Circuit Rule 41-1 ("[A] motion for stay of mandate pursuant to FRAP 41(d), pending petition to the Supreme Court for certiorari, will not be granted as a matter of course, but will be denied if the Court determines that the petition for certiorari would be frivolous or filed merely for delay.").

As demonstrated below, there is no plausible argument that a petition for certiorari here would be "frivolous" or filed "merely for delay." Indeed, on three previous occasions when the Court ruled in the Cassirers' favor, TBC's motions for stay of the mandate were granted.[1] As TBC acknowledged in those motions, "[t]his Court interprets this rule leniently,"[2] and it argued in 2014 that "the Supreme Court has a demonstrated interest in this case." No. 12-56159, D.E. 54 at 13. Now, of

---

[1] No. 06-56325, D.E. 84, 94 (2010); No. 12-56159, D.E. 54, 55 (2014); No. 15-55977, D.E. 151, 154 (2017).

[2] No. 12-56159, D.E. 54, at 5; No. 15-55977, D.E. 151, at 6.

course, the Supreme Court has emphatically "demonstrated interest in this case" by granting the Cassirers' 2021 certiorari petition and reversing this Court's choice-of-law decision. The Supreme Court's prior decision upholding the Cassirers' position supports a stay of the mandate so the Cassirers can pursue another certiorari petition.

## III. TBC's Position on the Motion

Counsel for Defendant-Appellee Thyssen-Bornemisza Collection ("TBC") has stated via email that TBC opposes the motion.

## IV. Argument

The Court's Decision that California choice-of-law rules require application of Spanish, rather than California, substantive law as the rule of decision to determine ownership of the Painting raises several substantial questions meriting review by the Supreme Court.

**First**, the Decision fails the fundamental requirement under the Supremacy Clause that relevant Federal laws, policies, and international agreements must be incorporated into application of state law. Pet. at 27-30.

In this case, that means that under California's *Kearney* factors for determining choice-of-law, the balancing under the third factor – comparative impairment – must include as part of California's interests in applying its own law the interests of the United States that are expressed in Federal laws, international agreements, and government policies. *See Id.* In particular, under the Supremacy

Clause, California's interests for choice-of-law purposes necessarily encompass Federal laws, international agreements, and policies protecting the rights of the true owners of Nazi-looted art. *See Testa v. Katt*, 330 U.S. 386, 391 (1947); *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1879) (The "laws . . . of the United States are as much a part of the law of every State as its own local laws and Constitution.").

The Decision entirely ignored these interests, despite Plaintiffs having raised them in their briefing. When these specific Federal interests in protecting the victims of Nazi depredations are included as part of California's interests under the third *Kearney* factor, it is impossible to conclude that those interests are not more impaired than Spain's interests in application of its general rules of adverse possession, which were adopted in 1889 and never amended to take account of the horrors of genocide in the twentieth century.[3]

Plaintiffs' briefing discussed the Federal interests at length. They include:

1. **Hague Convention**. The United States is bound by the Hague Convention of 1907, a treaty that outlaws pillage in armed conflicts, and calls for the courts to return looted artworks to the rightful owners. *See* Hague Convention (IV) arts. 47, 56, 36 Stat. 2277, 2307, 2309 (Oct. 18, 1907);

---

[3] As Judge Graber demonstrated (D.E. 175-1 at 4, 9, 17-19, 22), and as the Cassirers have argued (Pet. at 14), Spain's own policy position is mixed at best, since its formal expressions of policy include express protection of the rights of Holocaust victims. *See* pp. 10-11 below.

*Menzel v. List*, 267 N.Y.S.2d 804, 811 (N.Y. Sup. Ct. 1966) (relying on the Hague Convention in applying state property law, holding that "[w]here pillage has taken place, the title of the original owner is not extinguished"). Congress and the Executive Branch likewise have applied the Hague Convention to Nazi looting as a matter of U.S. law and policy. *See, e.g.*, points 3 and 6 below.

2. **U.S. Military Law in Germany**. During and after World War II, the United States led the world in invalidating Nazi confiscations and enforcing restitution of looted artworks. For example, Law No. 52 of the post-war Allied Military Government of Germany (which was in effect when the Painting was moved to California in 1951) declared "null and void" any unlicensed transfer of looted artworks and prohibited "any transfer, contract, or other arrangement made . . . with the intent to defeat or evade the restitution of any [such] property to its rightful owner." *See* Pet. at 29; *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 843-45 (E.D.N.Y. 1981), *aff'd* 678 F.2d 1150 (2d Cir. 1982) (rejecting ownership claim made by alleged good faith purchaser who relied on German 10-year adverse possession rule, because "Military Law No. 52 . . . precluded the transfer of good title").

8

3. **State-War-Navy Coordinating Committee**. The Executive Branch's State-War-Navy Coordinating Committee ("SWNCC") reiterated U.S. policy barring importation of Nazi-looted art:

> The introduction of looted objects of art into this country is contrary to the general policy of the United States and to the commitments of the United States under the Hague Convention of 1907 and in case of objects of a value of $5,000 or more is a contravention of Federal law. It is incumbent on this Government, therefore, to exert every reasonable effort to right such wrongs as may be brought to light.

SWNCC, Return of Looted Objects of Art to Countries of Origin, 16 Dep't State Bull. 358, 358 (Feb. 23, 1947).

4. **State Department Tate Letter of 1949**. The "Tate Letter" further reiterated the U.S. "Government's policy of undoing forced transfers and restituting identifiable property" to Nazi victims, including that "*with respect to claims asserted in the United States* for the restitution of identifiable property . . . lost . . . as a result of Nazi persecution in Germany, [the policy] *is to relieve American courts from any restraint upon the exercise of their jurisdiction*," and "*applies generally despite the existence of purchasers in good faith*." 20 Dep't State Bull. 592, 593 (Apr. 27, 1949) (emphasis added). *See Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375, 376 (2d Cir. 1954) (applying Tate Letter as controlling statement of U.S. government policy).

9

5. **UNESCO Convention on Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property (1970)**. The signatory countries, including the United States and Spain, undertake to prevent "illicit import or export of [cultural] property . . . [and] "facilitat[e] the earliest possible restitution of illicitly exported cultural property to its rightful owner."

6. **Holocaust Victims Redress Act of 1998**. The Holocaust Victims Redress Act (HVRA) expressed the sense of Congress that: "[C]onsistent with the 1907 Hague Convention, all governments should undertake good faith efforts to facilitate the return of . . . works of art, to the rightful owners in cases where assets were confiscated from the claimant during the period of Nazi rule and there is reasonable proof that the claimant is the rightful owner." Pub. L. No. 105-158, § 202, 112 Stat. 15 (1998). Thus, the HVRA necessitates return of Nazi-looted art where, as here, undisputed proof shows the Cassirer heirs are the rightful owners.

7. **Washington Principles (1998) and Terezin Declaration (2009)**. The United States, Spain, Germany and over 40 other countries adopted the Washington Conference Principles on Nazi-Confiscated Art (1998) and Terezin Declaration of Holocaust Era Assets and Related Issues (2009) which call for Nazi-looted artworks to be returned to the rightful owner,

and for disputes to be resolved "on the facts and merits," and not technical defenses such as the passage of time.[4]

8. **HEAR Act**. In 2016, Congress unanimously passed the Holocaust Expropriated Art Recovery (HEAR) Act, which adopted a national six-year statute of limitations based on "actual discovery" for claims to recover Nazi-looted art. 130 Stat. 1524 (2016). The HEAR Act's "purpose . . . is to open courts to claimants to bring covered claims and have them resolved on the merits." S. Rep. No. 114-394, 2016 WL 7156565, at *9. The HEAR Act's six-year filing deadline applies "notwithstanding . . . any defense at law relating to the passage of time." HEAR Act § 5(a). The Act explains that the extended limitation period and "actual discovery" trigger are required by the "unique and horrific circumstances of World War II and the Holocaust," which require survivors and heirs to "painstakingly piece

---

[4] This Court and the district court agreed that Spain is violating these agreements, but the courts erred in failing to give any weight to the Federal policies that they embody in analyzing California's interests in the third step of *Kearney's* comparative impairment analysis. Moreover, an amicus brief of the Jewish Communities of Madrid and Spain pointed out that Spain's Ministry of Culture (newly-reconstituted following Spain's 2023 general election), which controls TBC, has publicly acknowledged "that the case could have been handled differently within the framework of international agreements on seizures of works of art by the Nazi regime." D.E. 160-2, at 18-22.

11

together their cases from a fragmentary historical record ravaged by persecution, war, and genocide." *Id.* § 2(6).

Indeed, the HEAR Act expressly states that U.S. policy is embodied in the provisions described above: "*the enactment of a Federal law is necessary to ensure that laws governing claims to Nazi-confiscated art and other property further United States policy* as set forth in the Washington Conference Principles on Nazi-Confiscated Art, the Holocaust Victims Redress Act, and the Terezin Declaration." *Id.* § 3(1) (emphasis added).[5]

9. **Reiteration of Federal Policy in March 2024**. Any possible doubt about the continuing importance of U.S. policies discussed here is eliminated by the remarks of Secretary of State Antony Blinken on March 5, 2024, at the U.S. Holocaust Memorial Museum on the 25th anniversary of the

---

[5] States have relied on Federal policy in rejecting application of a constructive discovery rule to theft of artworks, as California did in adopting CCP § 338(c)(3). *See Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 320 (N.Y. 1991) (when the Governor of New York vetoed legislation that would have effectively applied a constructive notice rule, he relied "on advice of the United States Department of State, the United States Department of Justice, and the United States Information Agency. . . . [T]he Governor expressed his concern that the statute '[did] not provide a reasonable opportunity . . . to receive notice . . . and take action to recover stolen artworks before [true owners'] rights are extinguished.'").

12

Washington Principles.[6] His remarks could have been addressing this very case:

> Of the millions of works of art and cultural property stolen by the Nazis, countless objects still have not been returned to their owners. Today, too many governments, museums, dealers, galleries, and individuals still resist restitution efforts . . . while heirs confront staggering legal and financial barriers as they go up against opponents whose resources vastly outmatch their own.

Secretary Blinken emphasized the importance of restitution to preserve the truth about the Holocaust and fight antisemitism:

> Holocaust distortion and denial are again on the rise. We have seen time and again how the individuals, groups, and societies who downplay or refute the Shoah foster antisemitism and violence against Jews. These Best Practices offer a critical tool to counter their efforts to forget, to obfuscate – by memorializing the truth about what the Nazis did, who they hurt, what they took.[7]

***Second***, the foregoing provisions of Federal law, international agreements, and policies preempt this Court's interpretation of California choice-of-law rules to

---

[6] https://www.state.gov/secretary-of-state-antony-j-blinken-video-remarks-at-the-25th-anniversary-of-the-washington-principles-on-nazi-confiscated-art-and-best-practices-event/.

[7] Secretary Blinken's observation mirrors the views of several of the most prominent Holocaust scholars and Jewish and Survivor organizations in the world, who filed an amicus brief explaining that "[t]he panel decision minimizes the history of the Nazis' brutal campaign of dispossession against the Jewish people by treating this case as an ordinary commercial property dispute, thereby anesthetizing both history and fact." D.E. 158-1, at 16.

13

require application of Spanish law where it strips title to an artwork admittedly looted by the Nazis from the heirs of Holocaust survivors. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) ("[S]tate law is [ ] preempted to the extent of any conflict with a federal statute."). Clearly here, "the challenged state law [*i.e.*, California choice-of-law rules as applied by the Decision], stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress," *id*., as established here by the Hague Convention, the HVRA, the HEAR Act, international agreements to which the United States (and Spain) is bound, and express U.S. Government policies reiterated as recently as a few months ago by Secretary Blinken.[8]

*Third*, the Court's interpretation of California choice-of-law rules to require application of Spain's adverse possession law to defeat the Cassirers' substantive rights under California law is expressly preempted by the HEAR Act. As noted, the HEAR Act empowers Holocaust survivors and heirs to recover Nazi-looted art within six years of their actual discovery of the artwork's location "notwithstanding . . . *any defense at law relating to the passage of time*." HEAR Act § 5(a) (emphasis added). On its face, Spain's Civil Code Article 1955 is a "defense at law relating to the passage of time;" indeed, the Decision granted TBC title superior to the

---

[8] *See* amicus brief of Monuments Men and Women Foundation, a charity whose mission includes continuing the work begun during World War II by its namesakes in the U.S. military to achieve restitution of stolen artworks. D.E. 159-2.

14

Cassirers, the rightful owners, based solely on the "passage" of three years. 89 F.4th at 1233. Under the plain language of the HEAR Act, the Act's six-year actual discovery rule applies "notwithstanding" TBC's Article 1955 defense. *See, e.g., Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citations omitted); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) ("We interpret this language according to its 'ordinary, contemporary, common meaning.'") (citations omitted).

Notwithstanding these settled principles of statutory construction, the Court held that "HEAR simply supplies a statute of limitations during which such claims are timely. Thus, HEAR does not alter the choice-of-law analysis this Court uses to decide which state's law will govern TBC's claim of title to the Painting based on acquisitive prescription." *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951, 964 (9th Cir. 2017) ("*Cassirer III*"). That ruling conflicts with the plain meaning of the HEAR Act, which precludes a U.S. court from recognizing any "defense at law relating to the passage of time." HEAR Act § 5(a).

*Fourth*, a bill that is now pending before the California Legislature would, if enacted, provide another basis for seeking certiorari. Assembly Bill 2867 would

15

mandate application of California substantive law in cases brought by California residents to recover stolen artworks in the possession of a museum or covered by the HEAR Act.[9] By its express terms, the law would apply to all actions pending on its effective date, which would occur immediately upon approval by the Governor. As of the date of this Motion, AB 2867 has unanimously passed the California State Assembly and the Senate Judiciary Committee,[10] and is likely to be taken up by the full Senate upon return from recess on August 5, 2024.

---

[9] The bill would amend the current CCP § 338(c) to add subsection (6), which would provide:

> (6) Notwithstanding any other law or prior judicial decision, in any action brought by a California resident, or by an heir, trustee, assignee, or representative of the estate of a California resident, involving claims relating to title, ownership, or recovery of personal property as described in paragraph (2) or (3) [involving, *inter alia*, stolen artwork], or in the Holocaust Expropriated Art Recovery Act of 2016 (HEAR) (Pub. L. No. 114-308), including claims for money damages, California substantive law shall apply. This paragraph shall apply to all actions pending on the date this paragraph becomes operative or that are commenced thereafter, including any action in which the judgment is not yet final or the time for filing any appeal, including a petition for a writ of certiorari in the United States Supreme Court, has not expired, or, if filed, has not been decided.

*See* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240AB2867

[10] https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=202320240AB2867

16

In response to the Decision, AB 2867 was introduced to express the Legislature's view that the Decision misconstrues California law, and is inconsistent with earlier California statutes and caselaw and with Federal law. This is spelled out in Legislative findings in Section 1 of AB 2867 as passed by the Senate Judiciary Committee.

With the possibility of enactment of AB 2867 prior to the Cassirers' deadline for filing a certiorari petition (currently October 7, 2024), staying issuance of the mandate will enable the Cassirers to move directly in this Court for application in this case of amended CCP § 338(c) if it is enacted. *See*, *e.g.*, *Bryant v. Ford Motor Co.*, 886 F.2d 1526, 1530 (9th Cir. 1989) (Congressional passage of statute changing outcome of Ninth Circuit case warranted stay of mandate so that Supreme Court would not use its resources to address "an issue that Congress already had settled").

Similarly, if the California Legislature enacts AB 2867, it would best serve the interests of judicial economy for Plaintiffs to bring the matter directly to this Court without the need to recall the mandate or for the Supreme Court to act. *See*, *e.g.*, *Lords Landing Village Condominium Council v. Continental Ins. Co.*, 520 U.S. 893, 896 (1997) (where there is "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation, a GVR [Grant, Vacate, and

17

Remand] order is . . . potentially appropriate"); *Louisiana* v. *Hays*, 512 U. S. 1230 (1994) (Court issued GVR in light of enactment of new state statute).

## V.  Conclusion

For the foregoing reasons, the Cassirers respectfully request that the Court stay the mandate pending filing and disposition of a petition for a writ of certiorari in the Supreme Court.

Dated:  July 16, 2024              Respectfully submitted,

                                        /S/ *David A. Barrett*

DAVID BOIES                                                     DAVID A. BARRETT
BOIES SCHILLER FLEXNER LLP              BOIES SCHILLER FLEXNER LLP
333 Main Street                                               55 Hudson Yards
Armonk, NY  10504                                     New York, NY 10001
Tel:  (914) 749-8200                                   Tel:  (212) 446-2300

SAMUEL J. DUBBIN, P.A.                         STEPHEN N. ZACK
DUBBIN & KRAVETZ, LLP                        ANDREW S. BRENNER
1200 Anastasia Avenue, Suite 300         BOIES SCHILLER FLEXNER LLP
Coral Gables, FL 33134                            100 S.E. 2nd Street, Suite 2800
Tel:  (305) 371-4700                                Miami, FL 33131
                                              Tel:  (305) 539-8400

LAURA W. BRILL
KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 1725
Los Angeles, CA  90067
Tel:  (310) 556-2700

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2024, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

          */s/ David A. Barrett*
          David A. Barrett